**HILLSIDE PRODUCTIONS, INC., a Michigan corporation, Roncelli, Inc., a Michigan corporation, L.V. Management, Inc., a Michigan corporation, d/b/a Andiamo, Gary Roncelli, and Joseph Vicari, Plaintiffs,**

v.

**Steve DUCHANE, Jeffrey A. Bahorski, Paul J. O'Reilly, City of Sterling Heights, Michigan, and O'Reilly, Rancilio, Nitz, Andrews, Turnbull & Scott, P.C., individually and in their official capacities, jointly and severally, Defendants.**

No. 02–73618.

United States District Court,
E.D. Michigan,
Southern Division.

March 14, 2003.

884

Cindy R. Victor, Thomas J. Strobl, Strobl, Cunningham, Bloomfield Hills, MI, for Plaintiffs.

Suzanne P. Bartos, Plunkett & Cooney, Rosalind H. Rochkind, Robert D. Goldstein, John J. Gillooly, Garan Lucow, Steven M. Ribiat, Michael R. Turco, Butzel Long, Detroit, MI, for Defendants.

### OPINION AND ORDER GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

EDMUNDS, District Judge.

This matter is before the Court on Plaintiffs' motion for preliminary injunction. Plaintiffs Hillside Production, Inc. and others argue that Defendants' decision to revoke the Special Approval Land Use

under which they have operated Freedom Hill Amphitheater involves constitutional, statutory, and contractual violations; that they will be irreparably harmed by the revocation, and that they are likely to succeed on the merits of their claims. Plaintiffs seek an injunction requiring Defendants to reinstate the Special Approval Land Use, to desist from their campaign of harassment and interference, and to permit Plaintiffs to move forward with their bookings, sponsorships, ticket sales and other arrangements for the 2003 concert season. The Court conducted a hearing over the course of three days, March 4–6, 2003. Based on the evidence and argument submitted in open Court, the Court finds in favor of Plaintiffs and **GRANTS** the motion for preliminary injunction.

### I. Findings of Fact

Plaintiff Hillside Productions, Inc. ("Hillside") is a Michigan corporation organized and existing under the laws of Michigan, with its principal office and place of business located in Macomb County, Michigan.[1] Defendant City of Sterling Heights is a municipal corporation organized under Michigan law and existing in Macomb County, and at all times pertinent to this matter employed Defendant Steve Duchane as City Manager.

The property that is the subject of Plaintiffs' motion is commonly known as Freedom Hill Park, located at 15000 Metropolitan Parkway, in the City of Sterling Heights. Hillside is the sublessee of a portion of Freedom Hill Park under a sublease made May 19, 1999 between Hillside and the County of Macomb. Macomb County is the lessee of Freedom Hill Park under a lease made on June 5, 1973, between the County of Macomb and the Hu-

---

1. These foundational facts are set forth in Plaintiffs' First Amended Complaint and are not in dispute.

ron–Clinton Metropolitan Authority. The stated intent of the Macomb County lease from HCMA was to develop the premises as a public park and recreational area in accordance with the Outdoor Recreation and Open Space Plan for Macomb County. The Macomb County Lease provided that substantial progress had to be made within two years from the date of the lease in the implementation of the development of the Freedom Hill property, in accordance with the conceptual plans attached to the lease, which included an amphitheater.

In furthering its intent as expressed under the Macomb County Lease, on May 19, 1999, Macomb County entered into a ten-year sublease with Hillside, under which Hillside would manage and operate an entertainment facility in and around the Freedom Hill Amphitheater. On February 19, 2000, Hillside and Macomb County amended the sublease in part to extend it for a period of twelve years, with renewal options, and to require Hillside to provide Macomb County with a set of plans, specifications, and schedule of costs with regard to any proposed above-ground improvements. On March 29, 2001, Hillside and Macomb County again amended the sublease and acknowledged that Hillside had performed substantial development and underground improvements to the Freedom Hill Amphitheater area, in accordance with the Freedom Hill Amphitheater Master Plan.

Hillside received all necessary approvals from Macomb County and the HCMA before beginning work on Freedom Hill Amphitheater. Hillside initially constructed part of the project, investing approximately $3.5 million, and held nine concerts at Freedom Hill in the summer of 2000. As of this date, Hillside has completed improvements under the Freedom Hill Am-

phitheater Master Plan and has invested in excess of fifteen million dollars in improvements to the area.[2]

During the first nine months of 2000, which included the summer concert season, Defendant Duchane and other representatives of Defendant Sterling Heights deliberately and actively encouraged Hillside to proceed with the Freedom Hill Amphitheater project. (Hr'g Tr. Vol. I at 19–20, 29–33, Pollard testimony.) Duchane apparently interacted with Hillside representatives and granted local permits without consulting or informing the Sterling Heights City Council, which was led to believe all through this time period that the City had no jurisdiction to negotiate with or limit the activities of Hillside in any way. (Id.; Hr'g Tr. Vol. I at 58–60, 66–68, Fachini testimony; Pls.' Ex. PX 169.)

In the fall of 2000, after Hillside had already invested $3.5 million in Freedom Hill and successfully undertaken a summer concert season, Duchane and the City of Sterling Heights began a series of escalating demands. (Pls.' Ex. PX 169 at 14–30.) Defendants demanded payment for "services" provided in the park (despite the fact that public safety services were handled by the Macomb County Sheriff's Department), then demanded site plan approval, then demanded that Hillside apply for a Special Approval Land Use ("SALU"). (Id. at 29–30, 48.) These demands were justified by Defendants on the basis of Hillside's proposed additional improvements at Freedom Hill; for the first time, the City Council was made aware of the previously issued local building permits and involvement of the City with the Freedom Hill enterprise. (Hr'g Tr. Vol. I at 34–37, 58–61, Pollard and Fachini testi-

---

**2.** The exact amount of the investment to date is in dispute, but Defendants do not contest that it is substantial.

mony.) The City Attorneys, who had been actively involved with Freedom Hill from the beginning of the project, also led Council members to believe that they had been "left out of the loop" as the project developed. (Hr'g Tr. Vol. I at 39, Pollard testimony.)

Feeling coerced by their need to obtain building permits and their desire to obtain a liquor license, Hillside did apply for a SALU on February 9, 2001. (Pls.' Exs. PX 114, 109, 110, 111.) In preparation for this hearing, City Planner Norman Birr and an attorney from the City Attorney's office drafted a list of SALU conditions, many of which would have been operationally impossible to comply with. (Pls.'.' Ex. PX 182.) At a meeting of the Planning Commission of Defendant Sterling Heights on February 28,2001, at which neither City Planner Norman Birr nor Defendant Duchane was present, the Planning Commission approved the grant of a SALU to Hillside, but changed the proposed conditions. (Pls.' Ex. PX 110.) During that meeting, after an extended discussion as to the nature and extent of the sound limitations to be included, Commissioner Johns asked a member of the City Attorney's office "if the Planning Commission passed the approval with the 100–decibel sound limit, and this was part of the record, what would happen if the sound were too loud for the residents to the south? What would be the Planning Commission's ability to change the requirement?" As the minutes reflect, "Ms. Davis stated that the City would not be able to change the specific decibel level if it is already allowed in the ordinance." (Pls.' Ex. PX 101,109; Hr'g Tr. Vol. II at 116–17, Mende testimony.) Condition No. 5 of the SALU was amended to allow Hillside to have sound levels of up to 100 decibels from the top of the hill, and this condition was specifically approved as part of the SALU. (*Id.*) Other pertinent conditions included:

(2) That the petitioner and County of Macomb shall construct, maintain and operate the facility in compliance with all pertinent codes, ordinances and the standards of the City of Sterling Heights, County of Macomb and the State of Michigan;

(3) That the petitioner and the County of Macomb comply with the requirements of the City of Sterling Heights, and Sterling Heights Police Department with respect to traffic and parking considerations, including, but not limited to, being responsible for establishing and providing for the posting of "no parking" areas designated by the City. The Petitioner must also provide satisfactory reimbursement to the City of Sterling Heights for additional law enforcement staffing associated with this use and the accompanying traffic generated by this use;

(4) That all events, performances and other activities held at the amphitheater will end at a time not later than 11:00 p.m.;

(5) That all devices used to electronically amplify voices and/or music shall be directed or muffled to prevent any noise from exceeding 100 decibels, measured from the top of the hill. The petitioner will continually monitor noise levels during Hillside Productions events and make available all recorded decibel readings;

(Pls.' Ex. PX 110.)

Having complied with Defendants' conditions for the SALU, and additional demands imposed during the 2001 construction process, Hillside opened its 2001 concert season on June 7, 2001. Hillside did not receive a citation for violation of any ordinance after opening to the public on June 7, 2001. Nonetheless, on June 12, 2001, Defendant Duchane, having first

received advice from the City Attorney's office, issued an Official Notice which stated that an "Administrative Enforcement Hearing—Freedom Hill"—had been scheduled for June 20, 2001. (Pls.' Ex. PX 169 at 129.) At the hearing, the evidence focused on whether Hillside had fully complied with local zoning ordinances and conditions, rather than the express conditions of its Special Approval Land Use, including the condition relating to the 100 decibel limit on noise. (Pls.' Ex. PX 169 at 152; Pls.' Exs. PX 131, 189, 190.)

At the conclusion of the hearing, Defendant Duchane indicated that he would issue a decision concerning ordinance violations by the end of June, 2001. (Pls.' Ex. PX 131.) Over the next eight weeks, however, despite prompting by Plaintiffs, Duchane failed to make any decision concerning whether Hillside had committed any ordinance violations. The failure to resolve this issue made operations difficult for Hillside because it created an ongoing uncertainty about the status of its operations. Finally, on August 6, 2001, Hillside filed a complaint in Macomb County Circuit Court for superintending control and declaratory judgment, seeking the court's assistance in obtaining a decision from Duchane. The court promptly ordered him to issue a decision, and he did so on August 15, 2001. (O'Reilly Defs.' Ex. DX 515.) This decision found that Hillside had created a nuisance by noise at Freedom Hill Amphitheater, despite the uncontradicted evidence at the Administrative Enforcement Hearing that Hillside had not in fact exceeded the 100 decibel condition of the SALU. The nuisance determination was eventually overturned by the State Circuit Court, in two decisions dated June 21 and July 29, 2002, in which Judge Montgomery held that the express and specific terms of the SALU pre-empted other general zoning and land use restrictions; i.e., that the City could not enforce more restrictive conditions which conflicted with the express terms of the SALU. (Pls.' Exs. PX 189, 190.)

In the meantime, however, apparently furious over having been sued, Defendant Duchane began a campaign of harassment and retaliation against Hillside which continues to the present day.[3] City Council Members Jay Pollard and Roger Fachini, and City Planner Norman Birr, all testified that Duchane had vowed to put Hillside out of business, and, in the testimony of Birr, that Duchane directed City employees to go back and reexamine the Freedom Hill Amphitheater site plan for any possible problems related to off-street parking, legal description, or other possible legal issues. (Hr'g Tr. Vol. I at 42–43, Pollard testimony; at 70–72, Fachini testimony; at 138–142, Birr testimony.) Both the parking issue and the legal description had been examined thoroughly at the time the site plan was filed, and no problems were found at the time. Indeed, no parking problems were identified even after Birr was directed to take another look. For the first time, however, the City began complaining about a parcel of land included in the legal description, at first arguing that the legal description was over-inclusive, then changing its mind to say that the description was under-inclusive. (Hr'g Tr. Vol. I at 143–151, Birr testimony; Pls.' Ex. PX 188.) City Council members Pollard and Fachini both testified that Duchane had taken similar retaliatory action against another entity, a night club, which Duchane harassed with unwarranted viola-

**3.** For some reason, Defendant Duchane was not called to testify in this case and therefore offered no alternative explanation for the actions and motivations ascribed to him by City Council members Pollard and Fachini, by City Planner Birr, and by representatives of Hillside.

tions and investigations after the club had filed suit against the City. (Hr'g Tr. Vol. I at 43–45, Pollard testimony; at 71–73, Fachini testimony.)

Throughout the fall and winter of 2001–2002, the tension continued to mount between Hillside and the City. Testimony introduced at the hearing establishes that Defendant Duchane was directing Mr. Birr to comb the record of Hillside's submissions to try to find anything which might be characterized as a "false representation." (Hr'g Tr. Vol. I at 149–151, Birr testimony.) In addition, immediately prior to the 2002 concert season, the City suddenly decided to deny Hillside's applications for Special Licenses for the sale of alcoholic beverages at the Freedom Hill Amphitheater, despite there having been no changes in conditions since the preceding concert year. That action triggered litigation in this Court, which was settled in time for the licenses to be issued in due course.

Following receipt of the State Court Order prohibiting the City from enforcing a lower decibel level than the one established in the SALU (essentially overturning the City's determination of nuisance), the City appears to have set upon a course of creating contrived violations of Hillside's SALU, to use as the basis to seek revocation of that SALU, again as part of their pattern of harassment and retaliation and with the ultimate aim of renegotiating much more favorable terms for the City or putting Hillside out of business altogether. These included: issuing six criminal zoning violations against Hillside in connection with a haunted house being operated on the Freedom Hill property by another entity (Xanthus) after the City had already approved everything related to the Xanthus application and despite the fact that Hillside had nothing whatsoever to do with the haunted house operation (Hr'g Tr. Vol. II at 118–122, Mende testimony); chang-

ing the measuring system by which noise was monitored at the amphitheater (discarding the "a-weighted" scale which had been used the two prior years and which is identified in the City ordinances as the proper scale for measuring decibel level violations, in favor of the "c-weighted" scale, which had never been previously applied); deploying police in unwarranted numbers; invoicing Hillside for undocumented security expenses (and incidentally sending the invoices to the Roncelli, Inc. rather than to Hillside itself); and refusing to issue permits to complete the roof and dressing rooms at the amphitheater. (Hr'g Tr. Vol. I at 186–192, 214–221, Vol. II at 35–46, Birr testimony.)

This matter finally came to a head when Defendant Duchane and City Planner Norman Birr decided to convene a hearing on the revocation of Hillside's SALU in late September 2002. (Defs.' Exs. DX 632 and 624.) The revocation hearing notice sent to Hillside listed four conditions which Hillside had allegedly violated:

(2) That the petitioner and County of Macomb shall construct, maintain and operate the facility in compliance with all pertinent codes, ordinances and the standards of the City of Sterling Heights, County of Macomb and the State of Michigan;

(3) That the petitioner and the County of Macomb comply with the requirements of the City of Sterling Heights, and Sterling Heights Police Department with respect to traffic and parking considerations, including, but not limited to, being responsible for establishing and providing for the posting of "no parking" areas designated by the City. The Petitioner must also provide satisfactory reimbursement to the City of Sterling Heights for additional law enforcement staffing associated with this

use and the accompanying traffic generated by this use;

(4) That all events, performances and other activities held at the amphitheater will end at a time not later than 11:00 p.m.;

(5) That all devices used to electronically amplify voices and/or music shall be directed or muffled to prevent any noise from exceeding 100 decibels, measured from the top of the hill. The petitioner will continually monitor noise levels during Hillside Productions events and make available all recorded decibel readings;

(Pls.' Ex. PX 110.)

Despite the ongoing contact between Hillside and the City over the summer of 2002, much of which included accusations by the City that Hillside was violating ordinances, or conditions of its SALU, or simply doing something the City did not like, Hillside was never issued any complaints or tickets about noise, decibel levels, curfew violations, or unpaid invoices. Instead, Defendants summarily convened a revocation hearing. This was completely contrary to the standard procedure utilized by the City to resolve land use complaints, as testified to by Zoning and Planning Manager Donald Mende. (Hr'g Tr. Vol. II at 106–110.)

The revocation hearing was spread out over four sessions: October 23, November 13, December 4, and December 16, 2002. With respect to the procedures established for the revocation hearing, Hillside was advised at the beginning of the hearing that they could not cross examine any of the witnesses presented by the City. They were permitted to offer responsive evidence, but they could not respond to any of the new evidence raised by the City in its "rebuttal" to their response. They were not permitted to show video tape evidence because of a City policy (of which they were not previously informed) which required them to submit all video evidence to the City's public information office five days in advance of the hearing. They were not permitted to respond at all to any of the public comments and submissions. The City was permitted to submit its own video tape without having it preapproved. (Hr'g Tr. Vol. II at 59–63, Vol. I at 197–203, Birr testimony.)

The first condition the City alleged that Hillside violated was the condition which limited noise from "devices used to electronically amplify voices and/or music" to 100 decibels at the top of the hill. Mr. Birr testified that he knew Hillside had come to rely on the "a-weighted" scale for measuring decibel levels, since that is the scale which the City had used in the previous two years. (Hr'g Tr. Vol. I at 215, Birr testimony.) Notwithstanding this reliance, the City submitted evidence from its experts, Kalono and Sala, based on a "c-weighted" scale, rather than "a-weighted." (Hr'g Tr. Vol. I at 214–220, Birr testimony.) The City refused to provide the underlying data for the Kalono testimony despite numerous requests from Hillside. (Hr'g Tr. Vol. I at 213–14, Birr testimony.) When Hillside objected to the use of the "c-weighted" scale in their response, the City argued for an "unweighted" scale, despite testimony that no one uses an unweighted scale for this type of measurement because it is just linear and mechanical. (Hr'g Tr. Vol. I at 220–221, Birr testimony.) Although Mr. Kalono testified at the preliminary injunction hearing that Hillside violated the 100 decibel limit using the "a-weighted" scale, the City continues to deny Hillside access to the underlying data relied upon for this conclusion (and in any event, this was not what the planning commission was presented with and relied on in revoking the SALU).

The City also claimed that Hillside violated the condition requiring them to observe an 11:00 p.m. curfew at the amphitheater. It is clear from the evidence presented by the City that Hillside's concert performances at the amphitheater were all finished before 11:00 p.m. as required (Hr'g Tr. Vol. II at 11, Birr testimony), but that music continued in the VIP pavilion and concession area after that time (Id. at 12). Despite Mr. Birr's memo to the planning commission and his testimony at the hearing that the "plain language" of the SALU controls, the City took the position that the words "at the amphitheater" encompasses all of Freedom Hill, and that the 11:00 p.m. curfew meant that all music had to stop by that time. (Hr'g Tr. Vol. II at 12–14, Birr testimony.) It appears that the City began taking this position when it was clear that they were going to be limited by the terms of the SALU; i.e., after Judge Montgomery's decision reaching that conclusion, and they had to find a way to sustain violations of the SALU conditions. No tickets or violations were issued for the 2001 or June/July portion of the 2002 season based on curfew violations (that is, before Judge Montgomery issued his opinion limiting the City to the terms of the SALU), even though there were afterglows which included music past 11:00 p.m. at all events. (Hr'g Tr. Vol. II at 15–17, Birr testimony.) The curfew issue appears to have developed when a police sergeant (Anderson) who was sent out to document liquor and noise violations could not find any liquor violations, but mentioned that soft music could still be heard coming from the VIP tent after 11:00 p.m. (Defs.' Exs. DX 521, 522, 523; Hr'g Tr. Vol. II at 18–21, 27–28, 30–32, Birr testimony.) Despite these alleged violations, no action was taken by the police department and no officer from the planning commission was sent out concerning code enforcement—until the City sent Hillside the notice of the revocation hearing. (Hr'g Tr. Vol. II at 21–22, 33–35, Birr testimony.)

The City also claimed that Hillside violated the condition involving traffic and parking—arguing that Hillside had to reimburse the City for additional law enforcement related to those items. Birr provided the planning commission with a summary of invoices which he claims were unpaid, but the City again declined to provide any of the underlying data or invoices to Hillside, despite Hillside's requests for the information. (Hr'g Tr. Vol. II at 39, Birr testimony.) Birr acknowledges that the police services in question were not inside the park, but were outside the park on surrounding streets, and that the original invoices were for "investigative services" in addition to traffic. (Id. at 39–41, Birr testimony.) Even though the invoices had been sent to Roncelli, Inc. rather than Hillside, and even though Hillside disputed its responsibility to pay them, Hillside offered to pay the full amount in escrow to eliminate this as an issue of contention, but the City declined the payment. (Pls.' Exs. PX 200, 224; Hr'g Tr. Vol. II at 45–46, Birr testimony.)

The final condition on which the planning commission voted to revoke the SALU was Hillside's failure to file a new site plan and new master plan as a result of the resolution of a dispute over the legal description in the Hillside lease. That dispute had been the subject of a settlement in this Court in June, 2002; and pursuant to that settlement, Hillside had agreed to the metes and bounds description requested by the City, had provided a surveyor, had prepared a new dimensional drawing (Pls.'. Ex. PX 208), and had assumed the issue was resolved. Nothing in the federal court settlement required Hillside to file a new site plan or master plan, no one ever asked them to do so, and the planning commission was never even informed that

the legal description had been part of the earlier settlement. (Hr'g Tr. Vol. II at 50–58, Birr testimony.) This alleged violation had originally been submitted to the planning commission as a zoning variance violation, but the zoning commission declined to revoke the variance in its meeting of October 24, 2002; a fact which Mr. Birr did not even mention to the planning commission until Hillside's counsel raised it at the second of the four revocation hearing sessions, held on November 13, 2002. (Hr'g Tr. Vol. II at 48–49, Birr testimony.)

At the conclusion of the revocation hearing, the planning commission voted to revoke Hillside's SALU, following the recommendation of Mr. Birr. The City has taken the position that the revocation of the SALU means that Hillside cannot operate the amphitheater and is closed for good.

Both Michael Novak and Kevin Cassidy, Plaintiffs' witnesses, testified that the City's position on the revocation of the SALU and the closure of the amphitheater is causing irreparable harm. The summer entertainment market in the Detroit area is extremely competitive. (Hr'g Tr. Vol. III at 13–15, Cassidy testimony.) Managers and performers are cautious and conservative about choosing venues—they do not want to take a chance that a booking will be cancelled. (Hr'g Tr. Vol. II at 154–55, Novak testimony.) Three major agencies represent about eighty percent of the talent, so if an agent has a problem with a venue that will also affect other performers in the agency. (Id. at 155, Novak testimony.) Also, there is a small number of trade magazines read by virtually everyone in the industry, including Pollstar, which has published three articles about Hillside's problems. (Id.; Hr'g Tr. Vol. III at 9, Cassidy testimony.) Thus, if the 2003 season is cancelled, Hillside will find it virtually impossible to reestablish itself for a new season, even if one were to become possible in a subsequent year. (Hr'g Tr. Vol. II at 153, Novak testimony.)

There are also problems with sponsors and with season ticket holders. Sponsors are looking for a reliable positive experience with increasing traffic at a facility—if their experience is negative, they won't renew their sponsorship. (Hr'g Tr. Vol. II at 157–58, Novak testimony.) And again, there is a lot of competition for sponsorship dollars; many sponsors are already lined up or are being lined up now for the 2003 season. With season ticket holders, most of whom are corporations using the venue for entertaining clients, reliability is a key issue. Season ticket programs are heavily dependent on renewals, and most other venues are already advertising their summer season to potential season ticket purchasers. (Id. at 159, Novak testimony.)

Mr. Cassidy indicated that bookings start immediately after the preceding season, and that booking is a year-long process. (Hr'g Tr. Vol. III at 14–15, Cassidy testimony.) At this point, it would already be difficult to book a full season for 2003 because entertainers have made other commitments. (Id.) Although around seven performers have agreed to hold dates on the possibility that Hillside will be back in business for 2003, those decisions have to be finalized relatively soon; virtually every day is critical if Hillside is going to be able to put together a schedule for the 2003 season. (Id. at 24, Cassidy testimony.)

With respect to sponsorships, Hillside relies on sponsors to cover the cost of the talent, as well as corporate parties and other functions. (Id. at 17, Cassidy testimony.) Sponsors are concerned with the image of a venue as well as its reliability, and if Hillside is closed for the 203 season, it will have a tremendous negative impact on sponsorship—dollars will be relocated and may never be recouped. (Id. at 17–20,

Cassidy testimony.) Hillside has already lost one of the premier events it has had for the last several years; the Smooth Jazz Festival decided to commit elsewhere for the season. (*Id.* at 20, Cassidy testimony.)

## II. Standard of Review

■ When determining whether to issue a preliminary injunction, a district court must consider four factors: "(1) whether the movant has a 'strong' likelihood of success on the merits; (2) whether the movant would otherwise suffer irreparable injury; (3) whether issuance of a preliminary injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of a preliminary injunction." *Leary v. Daeschner*, 228 F.3d 729, 736 (6th Cir.2000) (citation omitted). The Court's determination as to the requested injunctive relief is reached by balancing these factors against each other. *United Food & Commercial Workers Union, Local 1099 v. Southwest Ohio Reg'l Transit Auth.*, 163 F.3d 341, 347 (6th Cir.1998) (citation omitted).

## III. Analysis

### A. Likelihood of Success on the Merits

#### 1. 42 U.S.C. § 1983

Section 1983 of 42 U.S.C. protects against the deprivation "of any rights, privileges, or immunities secured by the Constitution and laws" as a result "of any statute, ordinance, regulation, custom, or usage, of any State." To prevail, Plaintiffs must show that: (1) Plaintiffs were deprived of rights secured by the U.S. Constitution or laws of the United States; and (2) the deprivation was caused by a person acting under color of state law. *Upsher v. Grosse Pointe Pub. Sch. Sys.*, 285 F.3d 448, 452 (6th Cir.), *cert. denied*, — U.S. ——, 123 S.Ct. 88, 154 L.Ed.2d 135 (2002) (citing *Flagg Bros. v. Brooks*, 436 U.S. 149,

155–57, 98 S.Ct. 1729, 56 L.Ed.2d 185 (1978)).

■ To establish municipal liability, Plaintiffs must show "execution of a government's policy or custom which results in a constitutional tort. . . . The 'policy' requirement is not meant to distinguish isolated incidents from general rules of conduct promulgated by city officials. Instead, the 'policy' requirement is meant to distinguish those injuries for which [the municipality] is responsible under § 1983, from those injuries for which the [municipality] should not be held accountable." *Gregory v. Shelby County, Tenn.*, 220 F.3d 433, 441 (6th Cir.2000). "A court's task is to identify those who speak with final policy making authority for the local governmental actor concerning the action alleged to have caused the violation at issue." *Id.* (internal quotes and citations omitted). "In addition, a plaintiff must demonstrate that . . . the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights." *Id.* at 442 (internal quotes and citations omitted).

■ Under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), a single decision of a properly constituted legislative body "unquestionably constitutes an act of official government policy," and thus can serve as the basis of municipal liability under 42 U.S.C. § 1983. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479–80, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986). Plaintiffs in this case have satisfied their burden under *Monell*, claiming that the City Planning Commission's decision to revoke its Special Approval Land Use was an act of official government policy that violated their constitutional rights. Given this, Defendant City may be liable for damages under 42 U.S.C. § 1983.

Because it is uncontested that Defendants Duchane and the City were acting under color of state law, the proper inquiry is Plaintiffs' ability to show a likelihood of success on the merits of their claim that Defendants deprived them of rights secured by the Fourteenth and First Amendments to the U.S. Constitution.

The O'Reilly Defendants claim that they are not state actors; rather, they claim that they acted as City Attorneys and merely provided the City with legal advice and thus cannot be considered state actors for purposes of § 1983 liability.[4]

### a. Fourteenth Amendment Due Process Rights

### (i) Constitutionally Protected Property Interest

Plaintiffs allege that Defendants deprived Plaintiffs of a valuable property right without due process when Defendants revoked Hillside's Special Approval Land Use. *See Reed v. Village of Shorewood*, 704 F.2d 943 (7th Cir.1983).

■ The Due Process Clause prevents the government from depriving a citizen of "property" without due process of the law. To prevail on their claim that Defendants deprived them of their Special Approval Land Use (SALU) without due process, Plaintiffs must show:

(1) that they have a . . . property interest protected by the Due Process Clause of the Fourteenth Amendment;

(2) that they were deprived of this protected interest within the meaning of the Due Process Clause; and

(3) that the state did not afford them adequate procedural rights prior to depriving them of their protected interest.

*Med Corp., Inc. v. City of Lima*, 296 F.3d 404, 409 (6th Cir.2002).

■ Protected property interests do not arise from the Constitution, but rather from an independent source such as state law. *See Leis v. Flynt*, 439 U.S. 438, 441, 99 S.Ct. 698, 58 L.Ed.2d 717 (1979). Plaintiffs' property interest is based on their already approved Special Approval Land Use, not on a permit or an expectation of approval. A permit constitutes "property" only when the landowner has a right to it and a municipal decision-maker lacks the discretion to deny it. *See Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 576, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972) (observing that the Due Process Clause protects property interests including government benefits to which the plaintiff has a legitimate claim of entitlement). *See also Silver v. Franklin Twp. Bd. of Zoning Appeals*, 966 F.2d 1031, 1036 (6th Cir. 1992); *Triomphe Investors v. City of Northwood*, 49 F.3d 198, 202 (6th Cir. 1995); *Richardson v. Twp. of Brady*, 218 F.3d 508, 517–18 (6th Cir.2000). Entitlements to permits are rare. In this case, however, Defendants had already exercised their discretion to grant a Special Approval Land Use, and Plaintiffs' claim of entitlement is based on the express terms of the SALU itself, as well as related state statutes and local ordinances.

Defendants Duchane and the City contend that the municipal decision-makers had discretion to deny the SALU at issue here and that Hillside's SALU was revoked because Hillside failed to abide by its conditions. The issue is not, however, whether Plaintiffs had a right to the SALU in the first instance. Rather, the issue is whether the City, which had already granted Hillside the SALU, had the authority to revoke that valuable property interest and whether Defendants deprived Plaintiffs of a property interest without procedural due process.

---

4. That issue need not be decided in this hearing.

█ It is apparent that the City Planning Commission lacked the authority to revoke Hillside's Special Approval Land Use once it was granted. Under Michigan law, absent a specific grant of authority in either the Sterling Heights Zoning Ordinance or the enabling state statute which gives the City the right to create "Special Land Uses," the Planning Commission is powerless to revoke a previously approved Special Land Use. *See McVeigh v. City of Battle Creek*, 350 Mich. 214, 86 N.W.2d 279, 280 (1957) (holding that zoning boards of appeal "do not have the inherent power to grant a rehearing"); *Kethman v. Oceola Twp.*, 88 Mich.App. 94, 276 N.W.2d 529, 532 (1979) (observing that the *McVeigh* Court's holding also applies to "the authority of a township board to grant a rehearing").

In *McVeigh*, the Michigan Supreme Court affirmed a lower court decision holding that the Zoning Board of Appeals for the City of Battle Creek did not have the authority to grant a rehearing on a previously granted variance beyond five days after the grant. The lower court found that, pursuant to the language of the governing zoning ordinance which provided that board decisions do not become final until five days after its entry date, "if the Board does have the right of rehearing the same right must, as a matter of law, be exercised within the five days specified, unless it be shown that there has been fraud or mistake." *Id.* (quoting lower court decision). The *McVeigh* Court rejected the defendant City's argument that "a zoning board of appeals has inherent power to grant a rehearing where no rights have intervened between entry of the original order and the order granting a rehearing." *Id.* It further observed that:

> neither the statute nor the zoning ordinance grants or authorizes a rehearing. We are not unmindful of the fact that zoning appeal boards are not courts, nor are they possessed of the powers of a court. Such boards are limited to the statute and the ordinance. It is our opinion that such boards do not have the inherent power to grant a rehearing.

*Id.*

In *Kethman*, the Michigan Court of Appeals reversed a township board's reconsideration of a previously granted "land use" (which the court found to be in the nature of a variance), observing that:

> The [Michigan Supreme Court]'s admonition [in *McVeigh*, 86 N.W.2d at 280, that a zoning board of appeal does not have the inherent power to grant a rehearing] is also relevant to a consideration of the authority of a township board to grant a rehearing. *Here, also, neither the enabling act nor the defendant's ordinance provides for the rehearing of a granted variance.* Here, also the appeal board is imbued with no inherent powers, and thus possesses only those powers expressly invested in it by statute or ordinance. (See 3 Anderson, American Law of Zoning (2d ed), § 20.50, p 568.) For this reason we hold that the defendant township acted beyond authority in ordering reconsideration of the validity of the plaintiff's variance several months after the original hearing. This power, not granted by statute, will not be implied....

276 N.W.2d at 532 (emphasis added).

█ Under Chapter 25 of the Sterling Heights Zoning Ordinance, the Sterling Heights Planning Commission is given the power to approve or deny the granting of a Special Approval Land Use. Section 25.01, "Authority", states as follows:

> The City of Sterling Heights Planning Commission shall have the sole power to approve or disapprove all special land uses. In consideration of all applications for special land use, the planning commission shall review each case individually as to its appropriateness and

consider the following standards as it relates to the proposed land use. Such uses shall be subject to conditions, restrictions, and safeguards deemed necessary to the interest of public health, safety and welfare.

The Ordinance then sets forth in Section 25.03(B) what shall occur upon "Approval," and in Section 25.03(C) what shall occur upon "Denial." Nowhere in the Zoning Ordinance is the Planning Commission designated or empowered to institute or conduct a "revocation" hearing with respect to an established Special Approval Land Use or to revoke or terminate a Special Approval Land Use once granted. The only reference to revocation of any Special Approval Land Use which can be found in the Zoning Ordinance is in Section 25.03(B), where it states:

> In all cases where a particular special land use has been granted as provided herein, application for a building permit in pursuance thereof must be made and received by the city not later than one (1) year thereafter, or such approval shall automatically be revoked, provided, however, the planning department may grant an extension thereof for good cause shown under such terms and conditions and for such period of time not exceeding six (6) months as it shall determine to be necessary and appropriate. Any special land use that is discontinued or abandoned for a period exceeding one (1) year shall have its approval revoked.

The Michigan Enabling Act, MCLA 125.584a, which grants to cities the authority to provide for Special Land Uses in their Zoning Ordinances, is equally devoid of any grant of authority to the official body designated to handle Special Land Uses, beyond the authority to approve or deny the same. As the Enabling Act specifically states:

> (4) Power of designated official or body. The body or official designated in the zoning ordinance to review and approve special land uses may deny, approve, or approve with conditions, requests for special land use approval. The decision on a special land use shall be incorporated in a statement of conclusions relative to the special land use under consideration. The decision shall specify the basis for the decision, and any conditions imposed.

It is well-established that governmental bodies such as Zoning Boards of Appeal and City Boards are creations of the legislature and have only those powers granted to them in the enabling statutes and ordinances in which they find their origin. In the case at bar, Defendants have not provided this Court with any statute or ordinance which gives the Planning Commission the authority to revoke a previously granted Special Approval Land Use.

Likewise, Defendants' argument that the language of condition ten[5] of the Special Approval Land Use somehow gives the Planning Commission authority to revoke the Special Approval Land Use is not supported by precedent or the plain language of condition 10. The language in condition ten refers to the validity of representations made in the application to and at the hearing before the Planning Commission on February 28, 2001. It does not give any notice that should there be any violation of any of the conditions of the Special Ap-

---

**5.** Condition 10 of the SALU provides as follows:

> That the decision of the Planning Commission will remain valid and in force only as long as the facts and information presented to the Commission in public hearing are

found to be correct and the conditions upon which this motion is based are forever maintained as presented to the Commission.

Pls.' Ex. PX 110.

proval Land Use, knowingly or unknowingly, the Special Approval Land Use will be automatically revoked. This interpretation is supported by the fact that the Planning Commission has never revoked any other previously granted Special Approval Land Use. Rather than use established enforcement procedures; i.e., ordinance violations, citations, and state court appeals, that would provide Plaintiffs with the procedural due process rights to which they were entitled, Defendants Duchane and the City, without adequate notice or opportunity to respond, built a contrived case of noncompliance with the conditions of Hillside's SALU and presented it in a revocation proceeding they had no authority to conduct.

Plaintiffs are not required to exhaust their administrative remedies when alleging procedural due process claims. *See Nasierowski Bros. Inv. Co. v. City of Sterling Heights*, 949 F.2d 890, 893–94 (6th Cir.1991) (observing that "Sixth Circuit precedent reflects that this circuit adheres to the view... [that] a procedural due process claim is instantly cognizable in federal court without requiring a final decision on a proposed development from the responsible municipal agency."). Therefore, it is not relevant that Defendants offered Plaintiffs the opportunity to reapply for a new SALU.

Even if the City had the authority to conduct a revocation hearing, the record before this Court is also replete with evidence that Hillside was not afforded its right to due process at the revocation hearing, as set forth by this Court in its Findings of Fact. A fundamental tenet of procedural due process is that hearings be conducted before an impartial tribunal. *Ward v. Village of Monroeville, Ohio*, 409 U.S. 57, 59–60, 93 S.Ct. 80, 34 L.Ed.2d 267 (1972). This requirement of neutrality and fairness ensures "that no person will be deprived of his interests in the absence of a proceeding in which he may present his case with assurance the arbiter is not predisposed to find against him." *Marshall v. Jerrico, Inc.*, 446 U.S. 238, 242, 100 S.Ct. 1610, 64 L.Ed.2d 182 (1980). Plaintiffs have established that the revocation proceedings before the City Planning Commission lacked the requisite neutrality and impartiality. The City Planner, Norman Birr, acted as an advocate for revocation. (Defs.' Ex. DX 623; Hr'g Tr. Vol. I at 198–99.) He met with Planning Commission members outside the hearing to review the evidence with them. (Hr'g Tr. Vol. I at 206–07.) Thus, not only were procedural safeguards completely lacking in the revocation hearing, but all pretense of neutrality was abandoned as the City Planner became the prosecutor. (Hr'g Tr. Vol. I at 198.) Accordingly, Plaintiffs have shown to this Court that they have a likelihood of success on the merits of their claim of denial of due process.

### (ii) Constitutionally Protected Liberty Interest

Plaintiffs also allege that they have liberty interests; i.e., the freedom to engage in their chosen business and fund-raising activities, protected by the Fourteenth Amendment and that Defendants' interference with their right to engage in that business is arbitrary and thus unconstitutional. Plaintiffs further allege that Defendants deprived them of their liberty interests without due process. To prevail on their procedural due process claim in this § 1983 action, Plaintiffs must show:

(1) that they have a life, liberty, or property interest protected by the Due Process Clause of the Fourteenth Amendment;

(2) that they were deprived of this protected interest within the meaning of the Due Process Clause; and

(3) that the state did not afford them adequate procedural rights prior to depriving them of their protected interest. *Med Corp., Inc. v. City of Lima,* 296 F.3d 404, 409 (6th Cir.2002).

■■■ "[I]t is well established that the freedom to choose and pursue a career, to engage in any of the common occupations of life, qualifies as a liberty interest which may not be arbitrarily denied by the State." *R.S.S.W., Inc. v. City of Keego Harbor,* 18 F.Supp.2d 738 (E.D.Mich.1998) (internal quotes and citations omitted). *See also Parate v. Isibor,* 868 F.2d 821 (6th Cir.1989); *Sanderson v. Village of Greenhills,* 726 F.2d 284, 286–87 (6th Cir.1984) (holding that the plaintiff owner of a billiards parlor had stated a claim for deprivation of his liberty interest to engage in "whatever legal business he elects to pursue" and holding that the defendant City's interference with the plaintiff's business was arbitrary and thus unconstitutional); *Wilkerson v. Johnson,* 699 F.2d 325 (6th Cir.1983) (holding that harassment and delay in plaintiffs' attempt to obtain a barber's license constitutes a due process violation of the plaintiffs' liberty interest in the pursuit of that occupation); *Benigni v. City of Hemet,* 879 F.2d 473 (9th Cir.1988) (holding that the plaintiff, owner of a restaurant/bar, stated a cause of action for deprivation of a liberty interest by alleging that the defendant City engaged in a campaign of harassment that infringed on the plaintiff's constitutional right to pursue an occupation).

■■■ The evidence presented by Hillside establishes that they are likely to prevail on the merits of their claim that its principals have a liberty interest in the continued operation of Freedom Hill Amphitheater. They have devoted considerable time, energy and money to this venture, and the fact that it may not be the only component of their livelihood does not diminish its importance.

**b. Fourteenth Amendment Equal Protection Rights**

Plaintiffs also allege that Defendants violated the Fourteenth Amendment's equal protection clause when they selectively enforced the law by denying Plaintiffs' applications for special licenses for alcoholic beverage sales. Plaintiffs further allege that Defendants revoked Hillside's Special Approval Land Use and took other regulatory action against them both to punish them and to inhibit the exercise of their protected liberty and property interests and their First Amendment rights.

■■■ The Equal Protection Clause requires that those similarly situated should be treated alike. Under the Equal Protection Clause, an individual can bring a claim for the selective enforcement of an otherwise valid law or regulation. There are three types of selective enforcement claims: (1) those brought by members of a protected class alleging the government arbitrarily discriminated against them based on class membership; (2) those brought by individuals who claim they were punished for exercising a constitutionally protected right, *see Futernick v. Sumpter Twp.,* 78 F.3d 1051, 1056 (6th Cir.1996); and (3) those brought by individuals who are not members of a protected class and are not alleging an infringement of a constitutionally protected right but rather claim to be a "class of one" and allege that the government intentionally treated them "differently from others similarly situated and that there [was] no rational basis for the difference in treatment." *Village of Willowbrook v. Olech,* 528 U.S. 562, 564, 120 S.Ct. 1073, 145 L.Ed.2d 1060 (2000). It is the second type of selective enforcement which is at issue here.

■■■ To prevail on the second type of selective enforcement claim, also known as vindictive enforcement claims, Plaintiffs

must show: (1) exercise of a protected right; (2) the enforcer's "stake" in the exercise of that right; (3) the unreasonableness of the enforcer's conduct; and (4) that the enforcement was initiated with the intent to punish Plaintiffs for the exercise of the protected right. *Futernick,* 78 F.3d at 1056 n. 7. As the Sixth Circuit explained, "selective enforcement intended to discourage or punish the exercise of a constitutional right, especially the right to criticize the government, is sufficient basis for § 1983 relief." *Id.* at 1057.

Plaintiffs claim that Defendants' intentionally punished them, by selectively enforcing land use and liquor license regulations or laws, because of the exercise of Plaintiffs' constitutional rights; i.e., access to the courts and the right to petition the government. Accordingly, Plaintiffs' Fourteenth Amendment vindictive enforcement claims dovetail into their First Amendment claims (discussed below).[6]

### c. First Amendment Rights

■■■■ Plaintiffs allege that Defendants' campaign of harassment was in retaliation for Plaintiffs' exercise of their First Amendment rights; i.e., the August 6, 2001 lawsuit against the City of Sterling Heights and the City Manager and the May 29, 2002 lawsuit against the O'Reilly firm, City Attorneys. "[I]t is well established that '[t]he right to petition the government for redress of grievances is grounded in the [F]irst [A]mendment, and generally includes the right of every citizen to access to the courts.'" *R.S.S.W., Inc. v. City of Keego Harbor,* 18 F.Supp.2d at 747 (quoting *Gillard v. Norris,* 857 F.2d 1095, 1101 (6th Cir.1988)). Likewise, it is well established that "retaliation by public officials against the exercise of First Amendment rights is itself a violation of

the First Amendment." *Zilich v. Longo,* 34 F.3d 359, 364 (6th Cir.1994).

■■■■ To prevail on their First Amendment retaliation claim, Plaintiffs must show:

(1) that [Plaintiffs were] engaged in a constitutionally protected activity;

(2) that [Defendants'] adverse action caused [Plaintiffs] to suffer an injury that would likely chill a person of ordinary firmness from continuing to engage in that activity; and

(3) that the adverse action was motivated at least in part as a response to the exercise of [Plaintiffs'] constitutional rights.

*Bloch v. Ribar,* 156 F.3d 673, 678 (6th Cir.1998). As to the third element, Plaintiffs "must allege a 'chronology of events from which retaliation may plausibly be inferred.'" *Spruytte v. Govorchin,* 961 F.Supp. 1094, 1103 (W.D.Mich.1997) (quoting *El–Amin v. Tirey,* 817 F.Supp. 694, 699 (W.D.Tenn.1993), *aff'd,* 35 F.3d 565 (6th Cir.1994)).

■■■■ Based on the evidence presented, this Court finds that Plaintiffs are likely to succeed on the merits of the selective enforcement and First Amendment retaliation claims. Rarely does one hear such compelling and unrebutted evidence of the vindictive retaliatory action such as that taken by Defendant Duchane and the City of Sterling Heights as set forth above. The facts in this case establish a relentless pattern of harassment and vindictiveness, starting with the ratcheting up of demands in 2001, the unjustified administrative enforcement hearing and nuisance determination which had to be vacated by the State Circuit Court, the denial of the special liquor licenses for the 2002 season, the

---

6. Plaintiffs also claim that the government intentionally treated them differently from others similarly situated and that there was

no rational basis for the difference in treatment. That issue need not be decided in this hearing.

search for irregularities or "false representations" in Hillside's documentation, the denial of building permits to complete the roof and dressing rooms, the excessive police presence during concerts, the refusal to provide backup documentation for alleged noise and invoice violations, and the deliberate distortion of the terms and conditions of the SALU itself and the terms of the settlement of previous litigation in this Court. Every time Hillside attempted to protect its operations, the City turned the pressure up higher. It is clear that some residents of Sterling Heights were unhappy about Hillside's operation and were vocal about it. It is obvious that Hillside's operation was a thorn in the side of the City Manager. And, it is equally clear and obvious that Plaintiffs are likely to succeed on their claims that the City engaged in selective enforcement and vindictive retaliation.

#### d. Substantive Due Process

 Substantive due process is "the doctrine that governmental deprivations of life, liberty or property are subject to limitations regardless of the adequacy of the procedures employed." *Buckeye Comm. Hope Found. v. City of Cuyahoga Falls,* 263 F.3d 627, 641 (6th Cir.2001), *cert. granted in part,* 536 U.S. 938, 122 S.Ct. 2618, 153 L.Ed.2d 802 (2002) (internal quotes and citations omitted). Stated otherwise, substantive due process concerns "the right not to be subject to arbitrary and capricious action." *Id.*

To prevail on their substantive due process claims, Plaintiffs must first identify a constitutionally protected property or liberty interest. *Silver,* 966 F.2d at 1036. As discussed above, Plaintiffs have demonstrated a protected property interest in the continuation of the SALU. Plaintiffs must also show that the Defendants' actions were arbitrary and capricious "in the *strict sense,* meaning that there is no rational basis" for the decision. *Pearson v.*

*City of Grand Blanc,* 961 F.2d 1211, 1221 (6th Cir.1992) (internal quotes and citations omitted) (emphasis in original).

In this case, Defendants' revocation of the SALU as part of a campaign of harassment and retaliation constitutes an arbitrary and capricious deprivation of Plaintiffs' property right in that SALU. Thus, Plaintiffs are likely to succeed on the merits of a substantive due process claim, in addition to those already discussed.

#### B. Irreparable Harm

Plaintiffs allege that Defendants' revocation of their Special Approval Land Use results in the permanent loss of Hillside's right to engage in its established business and confiscates liberty and property rights that cannot be adequately compensated with money and thus warrants injunctive relief.

Defendants counter that Plaintiffs do have a complete and adequate remedy at law; i.e., they can reapply for a Special Approval Land Use on an expedited basis and could have timely appealed the revocation of their SALU to the Macomb County Circuit Court. Defendants further argue that lost profits and financial hardship do not satisfy the requirement of irreparable harm. *See Nagel v. Thomas,* 666 F.Supp. 1002 (W.D.Mich.1987); *Teamsters Local Union 299 v. U.S. Truck Co. Holdings, Inc.,* 87 F.Supp.2d 726 (E.D.Mich.2000). Rather, Defendants contend, Plaintiffs must show that Hillside's losses cannot be quantified or that they are not compensable by a monetary award.

Defendants also argue that Plaintiffs' inactivity has contributed to its losses; i.e., in December 2002 Hillside was assured of an expedited hearing if it reapplied for a SALU but it failed to do so, and denial of injunctive relief is appropriate in such circumstances.

Defendants' arguments are to no avail. It is well-established that a plaintiff can demonstrate irreparable harm "if the claim is based upon a violation of the plaintiff's constitutional rights." *Overstreet v. Lexington–Fayette Urban County Gov't*, 305 F.3d 566, 578 (6th Cir. 2002). "[W]hen reviewing a motion for a preliminary injunction, if it is found that a constitutional right is being threatened or impaired, a finding of irreparable injury is mandated." *Bonnell v. Lorenzo*, 241 F.3d 800, 809 (6th Cir.), *cert. denied*, 534 U.S. 951, 122 S.Ct. 347, 151 L.Ed.2d 262 (2001) (citing *Elrod v. Burns*, 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976)). Moreover, the testimony of Messrs. Novack and Cassidy clearly establishes irreparable harm as a factual matter. Defendants' actions have put Plaintiffs in jeopardy of losing their entire operation and investment at Freedom Hill. An injunction which enables Plaintiffs to go forward with the 2003 concert season may salvage the business as an ongoing concern, as opposed to the permanent loss Plaintiffs would surely suffer if the injunction were denied. Furthermore, Defendants are essentially arguing that Plaintiffs must give up their constitutionally protected interests and renegotiate a lesser deal that is more acceptable to the City. Defendants cannot argue that Plaintiffs are at fault for their own irreparable harm because they choose to fight for the rights they negotiated in the first instance.

### C. Harm to Others and Public Interest

Finally, Plaintiffs contend that the injunctive relief they seek will not cause harm to others and will serve the public interest because it will enforce the constitutional principle that laws be equally enforced and equally applied. Defendants counter that local residents have commented extensively about their distress over Hillside's operation at Freedom Hill, that the permit was revoked after 16 hours of public hearings, and that reinstatement of the SALU will undermine the validity of the City's Planning Commission rather than serve the public interest. Defendants urge the Court not to substitute its judgment for that of the Planning Commission and to require Plaintiffs to pursue other alternatives made available to them by the Planning Commission (reapply for SALU) or state law (appeal).

With respect to all of these issues, the Court finds that the balance of harms weighs heavily in favor of the injunction. The revocation puts Plaintiffs out of business and risks the loss of their entire investment of over $15 million. The residents will not be happy that Freedom Hill is still in business, but that issue should have been addressed years ago, when Hillside was first obtaining building permits from the City Manager despite his dissembling to the residents and the City Council. Defendants seem to believe that, because they do not like the deal they struck originally, they can force Plaintiffs into accepting other terms by manipulating the administrative process and exercising their municipal muscle as they see fit. That is not the way the law works.

### IV. Conclusion

Based upon the foregoing, the Court GRANTS Plaintiffs' motion for a preliminary injunction as follows:

1. The SALU is reinstated and Defendants are enjoined from initiating revocation proceedings, or other proceedings which might interfere with Plaintiffs' operations, unless expressly authorized by state statute or local ordinance;

2. Defendants are enjoined from interference with Plaintiffs' preparations for the 2003 concert season, including but not limited to, booking, sponsorship, advertis-

ing, ticket sales, licenses, permits or other operational approvals and arrangements;

3. Defendants are enjoined from using any noise measurement other than the "a-weighted" decibel scale to monitor noise at the Freedom Hill amphitheater;

4. Defendants are enjoined from interfering with afterglows in the VIP pavilion or concession area after 11:00 p.m., so long as the music is unamplified and confined to a reasonable time period following any concert, not to exceed one hour;

5. Defendants are enjoined from invoicing Plaintiffs for police or other traffic or parking services without providing all underlying documentation;

6. Defendants are enjoined from imposing any further requirements related to the legal description of Hillside's property; and

7. Based on the pervasive evidence of harassment and retaliation by Defendant Duchane and the City, Defendants are enjoined from unlawful interference with any of Plaintiffs' other businesses.

This Court retains jurisdiction to resolve any matter which might arise out of a dispute related to the parties, their businesses, or the operation of the Freedom Hill Amphitheater.

SO ORDERED.