RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 15a0223p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

─────────────────

JOHN W. PATEREK; CYNTHIA S. PATEREK; PATEREK
MOLD & ENGINEERING, INC.,

    *Plaintiffs-Appellants*,

    *v.*

VILLAGE OF ARMADA, MICHIGAN; BEN DELECKE,

    *Defendants-Appellees*.

No. 14-1894

─────────────────

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 2:13-cv-13966—David M. Lawson, District Judge.

Argued: June 11, 2015

Decided and Filed: September 8, 2015

Before: KEITH and CLAY, Circuit Judges; MARBLEY, District Judge.[*]

─────────────────

## COUNSEL

**ARGUED:** Cindy Rhodes Victor, THE VICTOR LAW FIRM, PLLC, Auburn Hills, Michigan, for Appellants. Caryn A. Ford, GARAN LUCOW MILLER, P.C., Detroit, Michigan, for Appellees. **ON BRIEF:** Cindy Rhodes Victor, THE VICTOR LAW FIRM, PLLC, Auburn Hills, Michigan, for Appellants. Caryn A. Ford, GARAN LUCOW MILLER, P.C., Detroit, Michigan, for Appellees.

─────────────────

[*]The Honorable Algenon L. Marbley, United States District Judge for the Southern District of Ohio, sitting by designation.

—————————

## OPINION

—————————

CLAY, Circuit Judge.  Plaintiffs John ("Paterek")[1] and Cynthia Paterek ("the Patereks"), along with their company Paterek Mold & Engineering, Inc. ("PME"), (collectively "Plaintiffs"), appeal the district court order granting summary judgment in favor of Defendants Ben Delecke, Commissioner of the Village of Armada Planning Commission, and the Village of Armada (collectively "Defendants"), in this § 1983 action.  Specifically, Plaintiffs appeal the adverse judgment on their First Amendment retaliation, substantive and procedural due process, and equal protection claims.  Plaintiffs also appeal the district court's decision to dismiss two motions seeking to hold Defendants in contempt of court.  Because there are genuine issues of material fact with respect to three of Plaintiffs' claims, and because the district court should have granted one of the motions for contempt, we hereby **REVERSE** the grant of summary judgment in favor of Defendants, **VACATE** the district court's denial of Plaintiffs' contempt motion, and **REMAND** this case to the district court for further proceedings consistent with this opinion.

## BACKGROUND

### A.      Initial Approval and Zoning Dispute

In 1993, the Patereks—owners of PME, an injection molding company—sought to relocate their business within Macomb County, Michigan to the Village of Armada.  The Patereks found a former high school auto shop ("the garage") that suited their needs and they purchased the building.  Unfortunately for the Patereks, the garage was located in a neighborhood with zoning restrictions that limited commercial activity to "general business," and injection molding is classified as a "light industrial activity."  The Patereks could commence operations at the garage only if they first obtained a Special Approval Land Use permit ("SALU") by successfully petitioning the Village of Armada Planning Commission ("the Planning Commission").

---

[1]All references to an individual Plaintiff refer to John Paterek, as the salient facts of this dispute are centered on his interactions with the Village of Aramada in both his professional capacity as a co-owner of PME and as a private citizen who engages in municipal politics.

On August 2, 1993, the Patereks went before the Planning Commission to advocate for the issuance of a SALU so that PME could begin operations at the garage; it was the third time that the Planning commission debated the Patereks' request. John Paterek believed Village officials were discouraging the Patereks from moving PME into the Village on account of their fear that those light-industrial activities might "generate too much noise" and set a "bad example" for other business in the community. (R. 2-2, June 12 Appeal, PGID 44) Despite any concerns the officials may have had, the SALU was issued following this third hearing. The Planning Commission, however, placed the following restrictions on the SALU: a prohibition against the "outside storage of any materials, supplies, or parts"; a limitation on permissible operating hours—7:00 a.m. to 8:00 p.m., Mondays through Saturdays; and a limitation on the number of full-time employees who could work at the garage. Another condition of the SALU required PME to resurface the parking lot within two years of occupying the garage. Defendant Ben Delecke, central to this dispute, was one of the Planning Commission members who joined in the unanimous approval of the time-restricted SALU.

PME commenced operations at the garage sometime in January 1994. The business was successful, so much so that PME began exceeding its permissible operating hours in order to meet the demands of a growing customer base. The workload also kept the Patereks from scheduling to repave the parking lot in time to meet the deadline stipulated in the SALU.[2] For that reason, John Paterek voluntarily went to the Planning Commission in February 1995, and he apprised that body of the predicament PME was facing. The Planning Commission responded, first, by reprimanding Paterek that PME should not be asking for additional accommodations and, next, by suggesting to Paterek that he could always sell the garage and relocate PME outside of the Village of Armada. [*Id.*] Shortly thereafter, on May 3, 1995, the Patereks received a letter notifying them of the Village's intent to take legal action against them for failing to comply with certain provisions of the garage's SALU; mainly, for failing to construct a retaining wall along the perimeter of the PME lot and for neglecting to make plans to have the parking lot paved with a hard surface. The Patereks immediately attempted to remedy the situation by building the requisite retaining wall, and by repaving the parking lot with crushed limestone (as an intermediate solution until they repaved with a hard surface).

---

[2]The Patereks' deadline for the repaving task would not arrive until August of 1995.

John Paterek wrote the Village Council on June 12, 1995, seeking to modify the terms of the SALU, prospectively, to quash any legal action threatened by the Village of Armada. In his letter, he requested the following: unrestricted operating hours for PME; the right to add signage and lighting to a garden he had recently crafted on the PME premises; the right to use a portion of the PME parking lot as an outside lunch area with a picnic table; the right to hire additional employees beyond the 14-employee cap; and an extension on his timeline to resurface the parking lot, or, in the alternative, approval of his crushed limestone lot as being in compliance with the SALU. Along with these requests, Paterek submitted numerous testimonials from neighboring businesses commending the Patereks' positive impact on the neighborhood due to the improvements PME made to the preexisting property. Following mixed public reaction to Paterek's requests, the Village Council directed Paterek to return to the Planning Commission and seek approval from that body.

Paterek submitted his request to the Planning Commission on July 3, 1995. Following a lengthy discussion, Defendant Delecke, who had been elevated to Commissioner of the Planning Commission, moved to reject the majority of Paterek's requests—to lift the restriction on PME's operating hours, to lift the restriction on the number of PME employees, and to afford the Patereks additional time to repave the PME parking lot. The motion carried upon a unanimous vote. (The requests for a lunch area with a picnic table and for lighted signage, however, were both granted.) Paterek appealed the decision to the Village Council. The Village Council reversed the Planning Commission and further modified the SALU by (a) affording the Patereks two more years to repave the parking lot, (b) allowing them to hire three more employees, and (c) easing the restriction on operating hours by extending the daily closing time and allowing for unlimited hours with respect to any emergency jobs.

Commissioner Delecke attended the Village Council meeting and spoke out against modifying the SALU for PME's garage. At that meeting, the Village Council determined that it should also investigate a decision of the Planning Commission to issue a SALU to a business associated with Commissioner Delecke. Delecke, at the next Planning Commission meeting, expressed his displeasure with both of the Village Council's decisions.

Plaintiffs alleged that following their successful appeal to the Village Council, Delecke determined to embarrass and harass the Patereks and their business. This harassment included disparaging John Paterek and maliciously spreading a false rumor that the Patereks had filed for bankruptcy. Delecke admitted to spreading the rumor, but he claimed that he believed the rumor to be true.

### B.     Downtown Development Authority

In 2004, John Paterek was appointed Chairman of the Armada Downtown Development Authority ("DDA"). Plaintiffs alleged that Delecke campaigned to have Paterek removed from the time he was initially appointed. This campaign was initially unsuccessful. By 2011, Paterek not only remained the Chairman of the DDA, he had also been elected Supervisor of Armada Township.[3] Delecke's harassment, Plaintiffs alleged, steadily intensified following Paterek's election to this second leadership role as the top administrative official of the Township, the political subdivision that encompassed the Village of Armada.

On November 14, 2011, Paterek received a letter from the Village Council, threatening his removal from the DDA chairmanship. The letter alleged the following bases as valid cause for Paterek's removal:

- Blatant disregard of Village Council directives
- Misrepresentation of council directives in public statements
- Failure to follow Government Funds and payment procedures
- Failure to follow Village Council meeting protocol
- Derogatory and threatening behavior exhibited during public meetings of the Village Council
- Personal attacks on Village Officials

The letter went on to note, "While we respect your absolute right to voice your opinion on these matters [the administration of other Village bodies], you have demonstrated a pattern of increasing hostility towards and lack of respect for your fellow public servants which has compromised your ability to serve on the Armada DDA."

---

[3]Armada Township is a political subdivision of Macomb County that encompasses the Village of Armada.

Paterek claimed to be shocked upon receiving this letter, and he denied any wrongdoing—other than having expressed his opinions on matters of public concern. He promptly replied to the letter by seeking clarification and requesting any and all evidence in support of the allegations. No response was offered.

Ultimately, the Village Council dissolved the DDA board in early 2013 and appointed Delecke as the new Chairman of the DDA; the Planning Commission constituted the new board. Plaintiffs alleged that this decision was a direct result of a dispute Paterek had with the Village in 2012 regarding the SALU for the garage. That dispute is detailed below.

### C.     Outside Storage Dispute

On March 7, 2012, prior to his removal from the DDA chairmanship, Paterek was notified that PME was violating the terms of the garage's SALU on account of work materials being strewn about the premises. Paterek agreed to remove the offending supplies as soon as possible, but on April 12, 2012, PME remained non-compliant, and the Village Building Inspector, Dennis LeMieux, sent Paterek a second warning notification. On April 16, 2012, Paterek responded by explaining the delay and notifying LeMieux that he had finished his most recent job, and that the materials were no longer being stored outside at the garage.

At the next Planning Commission meeting, held on April 19, 2012, PME was a major topic of discussion. The Planning Commission neglected to notify Plaintiffs about this meeting, but John Paterek was in attendance, having learned from another source that his business would be up for discussion at the meeting. Delecke explained to those in attendance that "Mr. Paterek is an industrial user in [a general business] district; he does not qualify to be there." (R. 2-11, Apr. 19 PC Mtng., PGID 90). Delecke described the details of the garage's SALU and then pronounced that Plaintiffs were knowingly violating the terms of the SALU by working during restricted hours and by keeping outside storage. Paterek contested Delecke's understanding of the term "outside storage," and argued that, in any event, the offending work materials had been removed following Inspector LeMieux's second request. Delecke disagreed, and he concluded that PME remained noncompliant because of a "plastic tote" and some "large pallets" that were still outside on the garage premises. Delecke ordered the parking lot cleared and declared that Paterek would be subject to "a fine of not less than $100 but not more than $1,000 per

infraction" if the Patereks failed to comply with this directive by April 30, 2012. (*Id.* at 91). Delecke also warned Paterek that the Planning Commission had the authority to rescind the garage's SALU.

The Planning Commission, historically, had not resorted to making similar threats. For example, Delecke declined to ticket Larry's Automotive for a SALU infraction that was nearly identical to the allegations levied against Plaintiffs. Instead, he opted to have a conversation with the owner of Larry's Automotive after informing the Planning Commission that "the only action available to us if we choose to do it is to instruct . . . LeMieux to initiate the violation process," which Delecke preferred not to do. (R. 36-2, Delecke Dep., PGID 920). Delecke explained the disparate treatment by noting that he was "not really the best of friends" with Paterek; he had a "personality conflict" with Paterek; Paterek's "views [were] different" than his own, and that Paterek should be held to a higher standard because he was the Supervisor of Armada Township, a position that allegedly included code enforcement responsibilities. (*Id.* at 921). Those were the reasons that Paterek was given a deadline to comply with Delecke's interpretation of the SALU or face the consequences.

Paterek removed the remaining items that Delecke identified as constituting outside storage prior to the April 30, 2012 deadline. Delecke, however, was not satisfied. On May 1, he directed LeMieux to inform Paterek that the snow plow on PME's parking lot also needed to be removed from view. Paterek complied with this additional demand, and Lemieux dictated in his notes, "complaint closed." (R. 36-5, LeMieux Notes, PGID 961). Nonetheless, LeMieux called Paterek the following week to demand that Paterek remove a barbeque grill that sat next to the lunch area situated on his parking lot. LeMieux did not actually believe that the grill constituted outside storage, but he had again been directed by Delecke to threaten Paterek with a citation. Paterek held his ground with respect to the barbeque grill, refusing to concede that it constituted outside storage and, therefore, a violation of the SALU.

On May 10, 2012, the Patereks received their first ticket for maintaining a barbeque grill outside on the garage premises. Next, on July 19, 2012 a letter from LeMieux was mailed to the Patereks advising them that the "barbeque remain[ed] in violation" of the SALU and that "the picnic tables being stored in [the] parking lot [were also] in violation of [the SALU]." (R. 2-13,

July 19, 2012 Ltr, PGID 96). Oddly enough, the picnic tables were one of the few modification requests that Delecke and the Planning Commission had approved back in 1995. Regardless, LeMieux forwarded notice of the violation to Village officials to initiate a lawsuit against John Paterek for failing to remedy the purported violations. Eventually, the Village moved for voluntary dismissal.

The decision to dissolve the DDA board was announced shortly after these events. John Paterek lost his position as Chairman of the DDA, and he was replaced by his rival, Commissioner (and now Chairmen) Delecke.

### D.      PME Expansion: the Workshop

In 2013, the Patereks sought to expand PME when a neighboring property owner decided to relocate and sell the building that housed his workshop; the workshop also held a SALU for light industrial activities. The two-story building housed an apartment on the second floor in addition to the workshop on the ground level. PME began leasing the property in early 2013 and began moving new equipment into the workshop while the details of the sale were being negotiated.

On June 17, 2013, LeMieux sent a notice to the property owner stating that Village ordinances required that the Planning Commission approve any new business at the property, and that a new Certificate of Occupancy ("COO") was also required. A substantially similar letter was directed to the Patereks on July 22, 2013, after they had officially purchased the property. The Patereks applied for a new SALU for the workshop, but they withdrew the application after being informed by their attorney that the preexisting SALU for the workshop remained valid. They, likewise, did not believe a new COO was required.

On August 8, 2013, LeMieux began issuing $150 tickets daily to the Patereks for their failure to apply for a COO for the workshop and for failing to seek approval from the Planning Commission for a new SALU. The Patereks received at least twenty-five tickets for the purported violations.

John Paterek contacted Village administrators, and he was informed that Delecke was again the driving force behind the tickets—incorrectly demanding that the Patereks needed to

apply for a second SALU at the workshop. The impetus for this demand is not clear, as it is undisputed that the workshop had previously been issued a SALU for light-industrial activities (which had not been revoked); and Delecke had specifically been informed a few months earlier that SALUs ran with the land and, therefore, need not be renewed upon a change in ownership. No explanation was provided with respect to Delecke's involvement concerning the COO, which, pursuant to the Village ordinances, was to be enforced and issued solely by the Building Inspector; it had no connection to the Planning Commission's jurisdiction.

Prior to letting out the second floor of their building, the Patereks planned to make certain repairs and renovations; once those repairs were completed, they would also need to apply for a COO, specific to the apartment. The Patereks applied for a permit to make the necessary repairs; however, an unidentified Village administrator directed LeMieux to refrain from issuing the Patereks any construction permits until they had first obtained a COO for the downstairs workshop. LeMieux testified that this was an "unusual," if not drastic, measure under the circumstances, but he complied with the directive.

### E.       Certificate of Occupancy

In demanding that the Patereks obtain a new COO for the workshop, the Village relied on the following provision of the zoning ordinances:

> **Certificates Required**. No land or structure hereafter erected or altered shall be occupied, used or changed in use until a certificate of occupancy shall have been issued by the Building Inspector. A certificate of occupancy shall be required prior to occupancy or re-occupancy of any use of land or structure. It shall be unlawful for any person, firm or corporation to occupy or permit the occupation of any structure or portion thereof until a certificate of occupancy has been issued.

(R. 16-4, Vill. Ord., PGID 4330).

On September 9, 2013, the Village filed suit seeking a preliminary injunction against Plaintiffs for continuing to utilize the newly-acquired workshop without a new COO or SALU. Plaintiffs contended that they were not required to obtain a new COO for the workshop because the building's primary purpose did not change—it remained a "machine shop"—and there was no lapse in occupancy, such that PME's expansion into the building could be considered a re-occupancy. Likewise, they contended that a SALU was unnecessary because the original SALU

remained valid. Plaintiffs thereafter submitted FOIA requests for Planning Commission meeting minutes to determine the treatment of other businesses. These requests were denied.

Plaintiffs were eventually able to obtain evidence that seven local businesses had no COO on file whatsoever: Lisa-Lea's Hair Salon; K-Lynn & Company; Chap's Restaurant; Main Street Chiropractor; Grunwald Family Dentistry; and two distinct locations of Larry's Automotive. The Village records also indicated that a portrait studio was allowed to begin its operations three months prior to its final inspection that was necessary for obtaining a COO. Moreover, when control of the portrait studio transferred to a new owner, a new COO was issued without inspection. Similarly, a pizzeria received its COO one month prior to having a final inspection. The pizzeria also changed ownership, and it, likewise, was issued a COO without passing an inspection; in fact, the pizzeria had failed its inspection due to serious fire code violations, yet it was still issued a COO.

## F.      District Court Proceedings

Plaintiffs filed suit against the Village, and against Commissioner Delecke, in his individual capacity, in the United States District Court for the Eastern District of Michigan, on September 16, 2013. Relevant to this appeal, Plaintiffs asserted a retaliation claim under the First Amendment, substantive and procedural due process claims under the Fourteenth Amendment, and an equal protection claim, also under the Fourteenth Amendment. Plaintiffs also asserted that the Village violated the Michigan Freedom of Information Act.

On September 25, 2013, Plaintiffs moved for a temporary restraining order to enjoin the Village from issuing further tickets and from attempting to invalidate the workshop SALU. The district court granted the motion (in part) on October 21, 2013. The Village was restrained and enjoined from issuing further tickets with respect to the workshop where PME housed its expanded operations. The Village was also restrained and enjoined from pursuing its prosecution related to the previously issued tickets and the continued use/occupancy of the workshop. Finally, the district court ordered Plaintiffs to submit a COO application for both areas of the building, to resubmit the construction permit applications for the apartment, and to

allow an inspection of the workshop by a neutral party. The Village thereafter would be required to issue the appropriate permits and certificates, assuming the inspections were satisfactory.[4]

Following a number of delays, the Village indicated that it required certain renovation plan documents from Plaintiffs prior to its inspection of the apartment. Plaintiffs were directed to provide the documents by December 3, 2013, after which point the Village was required to inspect the apartment and "either issue a [COO] for that part of the structure or specify the deficiencies in detail." (*Id.*)

A neutral official shortly thereafter inspected the workshop and discovered a number of issues that would need to be addressed before a COO could be issued. The district court on November 27, 2013 ordered Defendants to re-inspect the property at a later date and promptly issue a COO if Plaintiffs had remedied each of the deficiencies noted at the initial inspection; the district court also reaffirmed its order for Plaintiffs to provide Defendants with the requested documents prior to the impending deadline so that Defendants could inspect the apartment and promptly thereafter issue a COO for that portion of the premises. The Village was specifically directed to issue a COO for the workshop that was "in conformance with the existing [SALU]." (R. 22, Nov. 27 Order, PGID 505)

Plaintiffs proffered the requested documents by the December 3, 2013 deadline, and the Village scheduled an inspection for both portions of the building to occur a few days later. When the inspectors arrived at the property on December 6, 2013, they refused to inspect the upstairs apartment; the Village did re-inspect the workshop, and the Village confirmed that Plaintiffs had remedied all deficiencies.

The Village issued a COO for the workshop following the re-inspection, but the COO stipulated that Plaintiffs would be restricted to operating only between the hours of 6:00 a.m. and 5:00 p.m. The purported basis for this time constraint, according to the Village, was language from the original SALU. The SALU, however, stipulated only that the building's occupant

---

[4]The order was reissued on October 25, 2013 to account for the fact that the building inspector appointed by the court in the original order would be unable to conduct the inspections in the time period contemplated by the order due to previously scheduled commitments.

should "avoid conflicts with adjacent and neighboring properties during normal sleeping hours."[5] Plaintiffs identified for the Village the governing language contained in the workshop's SALU, but the Village refused to modify its position by removing the time restriction it had decreed as being a condition of the workshop COO.

With respect to the apartment, the Village claimed that its refusal to perform its inspection on that date was premised on the fact that Plaintiffs had made slight modifications to the site plan detailing the renovations, which the Village would have to review.

Plaintiffs thereafter filed a motion to place the Village in contempt of court for failing to comply with the district court's November 27, 2013 order, which required the Village (a) to issue a COO consistent with the pre-existing SALU, and (b) to promptly inspect the apartment upon receipt of the requested materials. The district court did not decide the motion until it also ruled on the merits, at which point all inspections had been completed and Plaintiffs had been granted a COO for the apartment; but the operating-hours restriction remained.

The Village next filed for summary judgment. Discovery continued while the contempt and summary judgment motions remained pending; Plaintiffs filed for partial summary judgment during this period.

As a result of requests made during discovery, Plaintiffs realized a new cause for concern with Defendants' conduct during the course of the litigation. LeMieux's notes from the Fall of 2013 indicated that the Village issued a COO for the workshop on October 24, 2013, long before any of the inspections that occurred in December. LeMieux's notes also indicated that one day later, October 25, 2013, he spoke with the Village's attorneys regarding the COOs. October 25, 2013 was the same day that the court issued its revised order reaffirming that Plaintiffs would have to submit to an inspection of the workshop. The details of LeMieux's conversation were redacted from his notes.

Based on this discovery, Plaintiffs filed a second motion for contempt, invoking the criminal contempt statute this time. Plaintiffs' theory was that the Village issued a COO, and then it deliberately withheld the COO from Plaintiffs (and failed to disclose the issuance to the

---

[5]Defendants' suggestion to the contrary is based on the fact that the previous owner of the building, in applying for the SALU, told the Village Council that his typical work hours lasted from 6:00 a.m. to 5:00 p.m.

court) after the Village learned that the court had granted its request to bar Plaintiffs from utilizing the workshop until a COO issued following an inspection. Defendants countered Plaintiffs' arguments by noting that there was no record of a COO actually being issued on October 24, 2013, and by contending that LeMieux's notes merely indicated that the Patereks had applied for a COO on that date. The court, as it did with the first motion for contempt, tabled the issue to be decided contemporaneously with the merits.

The district court issued its opinion and order on June 17, 2014. It denied the first contempt motion, reasoning that the Village had not "violated any definite and specific order of the court," because the November 27, 2013 order did not specifically prohibit the Village from issuing a conditional COO with time restrictions, and because the order did not specify an inspection date but, merely, required that the inspection be prompt. The district court also denied Plaintiffs' second (criminal) contempt motion because there was no definitive evidence that a COO had ever been issued on October 24, and LeMieux testified that he was out of town on that date. The notes, LeMieux suggested, likely reflected his own misinterpretation of a log entry made by the substitute building inspector. The court concluded by noting that after the issuance of the apartment COO, "the contempt motions serve[d] little purpose other than to prolong the acrimony between the parties," despite the Plaintiffs' continuing dispute concerning the limitation on operating hours at the workshop. (*Id.* at 1385).

Finally, the district court addressed the merits of the case, granting to Defendants summary judgment on each of Plaintiffs' constitutional claims.[6] Plaintiffs timely filed a notice of appeal with respect to the dismissal of their substantive claims and with respect to the dismissal of the motions for contempt.

## DISCUSSION

### I.    The Motions for Contempt

First, we address Plaintiffs' motions for contempt. A district court's decision to forego issuing an order of contempt is reviewed for an abuse of discretion. *Rolex Watch USA, Inc. v. Crowley*, 74 F.3d 716, 720 (6th Cir. 1996). This Court may not disturb the district court's determination unless it has a "definite and firm conviction that the trial court committed a clear

_____

[6]Plaintiffs prevailed on the FOIA claim, and they were awarded fees and costs.

error of judgment." *FTC v. EMA Nationwide, Inc.*, 767 F.3d 611, 623 (6th Cir. 2014) (internal quotations marks omitted). Reversal is warranted when the district court's judgment was undoubtedly mistaken or erroneous, but it is not warranted "simply because [this Court] would have decided the case differently." *Innovation Ventures, LLC v. N2G Distrib., Inc.*, 763 F.3d 524, 544 (6th Cir. 2014). Relying on an incorrect legal standard, misapplying the correct legal standard, or judging the outcome based on factual findings that are clearly erroneous, all constitute an abuse of discretion. *Yoder & Frey Auctioneers, Inc. v. EquipmentFacts, LLC*, 774 F.3d 1065, 1070 (6th Cir. 2014).

## A.      Civil Contempt

On a motion for civil contempt, the moving party bears the burden of proof in showing by clear and convincing evidence that the allegedly contumacious party violated a prior order of the district court. *Glover v. Johnson*, 75 F.3d 264, 267 (6th Cir. 1996). The order in question must be "definite and specific and ambiguities must be resolved in favor" of the party charged with contempt. *United States v. Conces*, 507 F.3d 1028, 1042 (6th Cir. 2007). Where no ambiguity exists, however, this Court must interpret the district court's decrees "to mean rather precisely what they say." *Grace v. Ctr. for Auto Safety*, 72 F.3d 1236, 1241 (6th Cir. 1996).

The district court's November 27, 2013 order directed the Village to inspect Plaintiffs' manufacturing workshop and issue a COO in conformance with the SALU, so long as the workshop passed the inspection; it also directed Plaintiffs to submit their site-plan documentation; and the Village was directed to promptly thereafter inspect Plaintiffs' upstairs apartment and either issue a COO or explain in detail why the COO should not be issued. These orders will be addressed in turn.

### 1.      The Nonconforming Workshop COO

In relevant part, the order reads: "[D]efendants agree that if they are allowed to inspect the manufacturing area of the building, and if they find that the deficiencies identified in that part of the building by the recent independent inspection have been corrected, then the defendants will issue promptly a [COO] allowing use of the manufacturing area *in conformance with the existing [SALU].*" (R. 22, Nov. 27 Order, PGID 505) (emphasis added). It is undisputed that all deficiencies at the workshop had been corrected prior to when the Village performed its

inspection. The Village promptly issued a COO, but it did not conform to the then-existing SALU, as was required by the court's order; instead, it placed a new operating-hours restriction on Plaintiffs' workshop.

The original SALU contained only one condition with respect to time: "The hours and days of operation, together with operational activities, shall be so scheduled and controlled as to avoid conflicts with adjacent and neighboring properties during normal sleeping hours." (R. 2-19, Korzen SALU, PGID 120). It is impossible to square this flexible limitation with the rigid time constraint the Village placed on Plaintiffs. The district court reasoned, and Defendants now argue, that the restriction was not inconsistent with the district court's prior order because that order "was silent as to content and conditions of the COO, and simply required that a COO must be issued if the property was found to be compliant with applicable regulations." *Appellee Br.* at 41 (quoting *Paterek v. Vill. of Armada*, No. 13-13966, 2014 WL 2766104, at *10 (6th Cir. June 17, 2014)). This contention is baseless in view of the explicit direction that the COO be "in conformance with the existing" SALU. There is no rational basis to support an interpretation of "normal sleeping hours" to mean anytime immediately after 5:00 p.m.[7] The district court abused its discretion, in connection with its consideration of Plaintiffs' contempt motion, by failing to hold that the Village violated its order, inasmuch as Defendants patently disregarded the district court's unequivocal instruction for Defendants to issue a COO that conformed with the then-existing SALU.

### 2.       Timely Apartment Inspection

Plaintiffs' second contention—that the Village failed to promptly inspect the apartment—is far less persuasive. The record evidence indicates that any delay in inspecting the apartment may be wholly attributable to the Patereks, inasmuch as the Patereks made alterations to their renovation plans, which Defendants needed to review prior to the inspection. For that reason, it cannot be said that the district court abused its discretion in finding that Defendants did not violate a clear and specific directive of the court.

---

[7]The restriction appears to be no more than an attempt to modify the SALU, which would require the Patereks' consent—Defendants failed to indicate any provision of the Village ordinances that allows for the imposition of conditions on a business' operational hours by way of a COO.

In summary, despite the district court's contrary contention, granting a meritorious contempt motion serves an essential purpose even though the COOs had already been issued at the time the motion was decided; an order holding Defendants in contempt in this case, if warranted, would provide an opportunity for the court to remedy Plaintiffs' injury (from suffering reduced operating hours) by requiring the issuance of a COO that actually conforms to the pre-existing SALU. *See Colling v. Barry*, 841 F.2d 1297, 1300 (6th Cir. 1988) ("[C]ivil contempt seeks to remedy a deprivation or a loss."). The district court abused its discretion in this case by failing to apply the proper legal criteria in deciding whether to hold Defendants in contempt after they violated a clear and unambiguous order of the court. *See Elec. Workers Pension Trust Fund of Local Union 58, IBEW v. Gary's Elec. Serv. Co.*, 340 F.3d 373, 382 (6th Cir. 2003). We therefore vacate the district court's order denying Plaintiffs' motion for civil contempt so that the matter can be reconsidered on remand.

The power to shape the appropriate remedy for a finding of contempt lies squarely within the discretion of the district court. *Id.* In this case, however, the district court apparently failed to appropriately consider the possibility of relief that would include the issuance of a COO without imposing additional time constraints on the operation of Plaintiffs' business, beyond those identified in the SALU.

## B.     Criminal Contempt

The criminal contempt motion turns on whether the Village withheld from Plaintiffs and the district court a COO that was issued for the workshop on October 24, 2013. A district court may refer an alleged contempt of court for criminal prosecution only when there is clear and convincing evidence that (1) a party purposefully acted in a contumacious manner, (2) resulting in the obstruction of judicial administration, (3) the bad behavior having "occurred in the presence of the court," and (4) it was intended to result in the obstruction. *United States v. Moncier*, 571 F.3d 593, 598 (6th Cir. 2009).

The only evidence proffered in support of Plaintiffs' motion was the reference in LeMieux's notes to a COO being issued on October 24, 2013. LeMieux's testimony, however, revealed that he was out of town on that date; his notes may have merely reflected an attempt to transcribe log entries made by a substitute inspector. Whether the Village issued a COO on that

date is not dispositive in this case because, based on the conflicting record evidence, it is clear that the district court did not abuse its discretion in denying Plaintiffs' motion.

## II.     Constitutional Claims

Next, we consider the district court's grant of summary judgment in favor of Defendants with respect to Plaintiffs' claims brought pursuant to 42 U.S.C. § 1983.

### Standard of Review

We review *de novo* a district court's grant of summary judgment. *Gillie v. Law Office of Eric A. Jones, LLC*, 785 F.3d 1091, 1097 (6th Cir. 2015). A motion for summary judgment should be granted when the material facts are not in dispute and the moving party, in light of the facts presented, is entitled to judgment as a matter of law. *Id.* Courts must view the facts in the light most favorable to the non-moving party. *Combs v. Int'l Ins. Co.*, 354 F.3d 568, 576 (6th Cir. 2004). But the nonmoving party must offer more than a mere "scintilla of evidence" in their favor to create a genuine issue of fact sufficient to avoid summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

### A.     First Amendment Retaliation

To succeed on a First Amendment retaliation claim, the following elements must be proven: "(1) the plaintiff engaged in constitutionally protected conduct; (2) an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) the adverse action was motivated at least in part by the plaintiff's protected conduct." *Fritz v. Charter Twp. of Comstock*, 592 F.3d 718, 723 (6th Cir. 2010). Defendants do not dispute that the first two elements have been satisfied—appealing an adverse judgment and speaking out against public officials are well-established as protected conduct, *see Leonard v. Robinson*, 477 F.3d 347, 357 (6th Cir. 2007), and the numerous tickets that were issued to Plaintiffs, the suits that were initiated against them, and the loss of John Paterek's position on the DDA patently constitute adverse actions, *see, e.g.*, *Fritz*, 592 F.3d at 724; *see also Garcia v. City of Trenton*, 348 F.3d 726, 729 (8th Cir. 2003). Therefore, we need only address the third element—the causal connection between elements one and two. If a plaintiff is able to establish a *prima facie* case of First Amendment retaliation, the burden then shifts to the

defendant to put forth evidence showing it would have taken the adverse action absent any retaliatory motive; summary judgment is only warranted if, viewing the evidence "in the light most favorable to the plaintiff, no reasonable juror could fail to return a verdict for defendant." *Dye v. Office of the Racing Comm'n*, 702 F.3d 286, 294–95 (6th Cir. 2012) (internal quotation marks omitted).

Causation is best addressed as a two part inquiry. First, we determine whether "the adverse action was proximately caused by an individual defendant's acts," and second, we consider whether "the individual taking those acts was motivated . . . by a desire to punish [the plaintiff] for the exercise of a constitutional right." *King v. Zamiara*, 680 F.3d 686, 695 (6th Cir. 2012) (internal quotation marks and citation omitted). The true object of this inquiry is to determine whether the plaintiff has been retaliated against as a direct result of his or her protected speech.

The first instance of protected speech cited by Plaintiffs in support of their claim is the successful appeal to the Village Council in July of 1995, which overturned the Planning Commission's decision to deny the Patereks' request for a modification of the garage's SALU. Delecke spoke out vehemently against Plaintiffs' appeal, which ultimately resulted in Delecke's own business being investigated. These facts lend support to drawing the inference that Delecke would seek retaliation against the Patereks; however, a retaliation claim cannot reasonably rest on the occurrence of this speech alone, because the first adverse action cited by Plaintiffs as an example of retaliation did not occur for nearly another two decades. *See Vereecke v. Huron Valley Sch. Dist.*, 609 F.3d 392, 400 (6th Cir. 2010) ("[T]he more time that elapses between the protected activity and the adverse . . . action, the more the plaintiff must supplement his claim with other evidence of retaliatory conduct to establish causality." (internal quotation marks omitted)). However, Plaintiffs' claim is not foreclosed simply due to the passage of time, because it is based on more than an isolated incident of protected speech. The first incident simply offers an explanation respecting the initial cause of the rift between Defendants and John Paterek.

Rather than rely on a single example of protected speech, Plaintiffs' theory of the case is that their recurring speech activities resulted in an escalating animus between Defendants and the

Patereks, which ultimately led Defendants to take the adverse actions at issue in this case. The following passages recount Plaintiffs' evidence that, when viewed in the light most favorable to them, supports the plausibility of their escalating animus theory.

In November of 2011, the Village Council explicitly threatened to depose John Paterek from his position as Chairman of the DDA as direct result of his protected speech. The Village Council asserted Paterek's outspoken disagreement with members of that body as the purported basis for menacing Paterek with the prospect of removal—characterizing Paterek's speech as "[p]ersonal attacks on Village Officials" and "[d]erogatory . . . behavior exhibited during public meetings." (R. 2-15, Notice of Cause, PGID 100). The Village Council acknowledged Paterek's "absolute right to voice [his] opinion" on public matters, *id.*, and no immediate action was taken after Paterek responded by forcefully contesting the Council's characterization of his speech activities. However, this matter was not concluded at that time.

A few months later, Paterek was once again at loggerheads with Village officials when he purportedly violated his SALU by leaving work materials outside on the garage premises in order to complete a project for one of his clients. Paterek subsequently removed the offending materials, and Inspector LeMieux was satisfied. Delecke, however, continued to involve himself after the matter was seemingly closed. At an ensuing Planning Commission meeting, Delecke indicated his belief that a "plastic tote," along with some "large pallets" that remained outside in the garage parking lot, also constituted outside storage. Delecke then gave Plaintiffs ten days to remove the items before he would demand that LeMieux issue a citation. This directive constituted a shift in policy, inasmuch as Delecke typically spoke with business owners about perceived violations as opposed to threatening them with sanctions. Nonetheless, Plaintiffs promptly complied with Delecke's instructions by removing the offending objects. LeMieux again believed that Plaintiffs were in compliance with the SALU and thought the matter was closed. However, Delecke relentlessly persisted in his campaign against Paterek by insisting that Plaintiffs' snowplow should then be removed from PME's parking lot as well. Plaintiffs again complied with Delecke's new directive. Yet Delecke remained dissatisfied. He next demanded that Plaintiffs remove a barbeque grill from PME's Planning Commission-authorized outside lunch area. The Patereks balked at this demand, the latest of Delecke's seemingly baseless quibbles. Delecke thereafter directed LeMieux to begin issuing citations for the purported

violations to enforce the terms of the SALU. Plaintiffs were issued a few tickets, which they refused to pay, before the Village commenced legal proceedings to prosecute John Paterek for the non-payment. The Village voluntarily withdrew from pressing its charges against Paterek, but shortly thereafter the Village dissolved the DDA and transferred the administration of the DDA to Delecke and his Planning Commission.

"Circumstantial evidence, like the timing of events or the disparate treatment of similar individuals, may support [the] inference [of a retaliatory motive]." *Arnett v. Myers*, 281 F.3d 552, 560–61 (6th Cir. 2002). The letter from the Village Council, in concert with the timing of Paterek's removal from the DDA following shortly after his dispute with the Planning Commission, constitutes strong circumstantial evidence of a retaliatory motive. The Village's disparate treatment of Paterek during the outside storage dispute and Delecke's strained reading of the SALU to prohibit a barbeque grill from a lunch area under the theory that it constituted "outside storage of any materials, supplies, or parts" provides additional circumstantial evidence that, when considered together, is sufficient to preclude summary judgment. *See Eckerman v. Tenn. Dep't of Safety*, 636 F.3d 202, 209–10 (6th Cir. 2010) (finding an inference of retaliatory motive even after a three year lapse in time, because there was subsequent circumstantial evidence of disparate treatment and allegations that the defendants had openly voiced their dislike of the plaintiff); *Thaddeus-X v. Blatter*, 175 F.3d 378, 399–400 (6th Cir. 1999) (en banc) (finding plaintiff's allegations about causation sufficient to survive summary judgment because they were "specific" and "nonconclusory" and defendants did little more than offer a summary denial of the allegations).

Defendants argue that the dissolution of the entire DDA board cannot reasonably be construed as an action taken against Paterek individually, but this contention rings hollow in light of the timing, the Village's letter to Paterek, and the result of the dissolution being that Delecke gained control of the DDA. Because a reasonable jury could conclude that Defendants retaliated against Plaintiffs for their protected speech activity, summary judgment was inappropriate on the grounds that there was no causal link to support an inference of retaliation.

**B.        Substantive Due Process**

Substantive due process, among other things, protects citizens from being subject to "arbitrary or irrational zoning decisions." *Pearson v. City of Grand Blanc*, 961 F.2d 1211, 1217 (6th Cir. 1992). To succeed on a substantive due process claim based on this theory, a plaintiff is required to show that "(1) a constitutionally protected property or liberty interest exists, and (2) the constitutionally protected interest has been deprived through arbitrary and capricious action." *Braun v. Ann Arbor Charter Twp.*, 519 F.3d 564, 573 (6th Cir. 2008) (internal quotation marks omitted). We will not "interfere with local zoning decisions unless the locality's action has no foundation in reason and is a mere arbitrary or irrational exercise of power." *Warren v. City of Athens, Ohio*, 411 F.3d 697, 707 (6th Cir. 2005) (internal quotation marks omitted).

Plaintiffs rely on two incidents to support their substantive due process claim: first, the outside storage dispute, which ultimately led to the Village attempting to prosecute Paterek; and second, the dispute over whether Plaintiffs were required to apply for a new COO and SALU, which also led to an attempted prosecution that was only cut off by order of the district court.

We look to state law to determine whether there is a recognized property interest, *EJS Properties, LLC v. City of Toledo*, 698 F.3d 845, 854 (6th Cir. 2012); specifically, we consider whether the plaintiff had a "legitimate claim of entitlement" or a "justifiable expectation" to rely on a zoning authorization. *Silver v. Franklin Twp. Bd. of Zoning Appeals*, 966 F.2d 1031, 1039 (6th Cir. 1992). This question has already been answered: under Michigan law, Plaintiffs had a recognized property interest in both the garage and workshop SALUs, and they had a legitimate claim of entitlement to the workshop COO, so long as the workshop passed the Village's inspection. *Dorr v. City of Ecorse*, 305 F. App'x 270, 275 (6th Cir. 2008) (citing *Dingeman Adver v. Algoma Twp.*, 223 N.W.2d 689, 691 (1974) and *Schenden v. Addison Twp.*, Nos. 244389, 245808, 2004 WL 1908231, at *5 (Mich. Ct. App. Aug. 26, 2004)); *see also Hillside Prods., Inc. v. Duchane*, 249 F. Supp. 2d. 880, 893 (E.D. Mich. 2003) ("Entitlements to permits are rare. In this case, however, Defendants had already exercised their discretion to grant a Special Approval Land Use, and Plaintiffs' claim of entitlement is based on the express terms of the SALU itself . . . .").

When viewed in the light most favorable to Plaintiffs, there is a disputed issue of fact as to whether Defendants' enforcement and permitting activity as related to the Patereks was arbitrary and capricious. With respect to the outside storage, Delecke admitted to handling Paterek in a different manner than other business owners; and Delecke's assertion that a barbeque grill (situated next to an authorized lunch area) constitutes outside storage strains credulity. Likewise, the Village has failed to offer any explanation of its attempt to prosecute Plaintiffs for refusing to obtain a new SALU, when it is undisputed that the Village was aware of the preexisting SALU and the fact that SALUs run with the land. Finally, the decision to withhold Plaintiffs' building permits for the apartment until Plaintiffs applied for a new COO at the workshop, in the Building Inspector's own words, was odd; and the COO that ultimately was issued unilaterally modified the terms of the workshop SALU in contravention of the district court order—placing an onerous operating-hours restriction on Plaintiffs that was inconsistent not only with the workshop SALU itself, but with the permissible operating hours at Plaintiffs' garage, which was right next door.

Based on these facts, a reasonable jury could find that Defendants acted arbitrarily and capriciously in deciding to (1) issue outside storage citations based on Paterek's barbeque grill, (2) seek prosecution against Paterek for his failure to apply for a new SALU, and (3) issue Paterek a COO that restricted his operating hours beyond that authorized by his pre-existing SALU for the workshop.

Defendants contend that Plaintiffs' claim is doomed for want of a cognizable injury, inasmuch as they were never deprived of a property interest because each of the attempted prosecutions was dismissed. This argument fails because a deprivation need not be permanent or complete to run afoul of the Constitution, *see, e.g., Edison v. Tenn. Dep't of Children's Servs.*, 510 F.3d 631, 635 (6th Cir. 2007), and, at minimum, Plaintiffs were deprived of the full benefits of the preexisting SALU for the workshop when the Village issued a COO restricting Plaintiffs permissible operating hours.

### C.     Procedural Due Process

Procedural due process requires that the government, prior to depriving an individual of their property, provide that individual with notice of the proposed action and an opportunity to be

heard. *Morrison v. Warren*, 375 F.3d 468, 473 (6th Cir. 2004). To establish a procedural due process claim, a plaintiff must show (1) the existence of a protected property interest at issue, (2) a deprivation of that protected property interest, and (3) that he or she was not afforded adequate procedures. *Daily Servs., LLC v. Valentino*, 756 F.3d 893, 904 (6th Cir. 2014). Plaintiffs' sole contention is that they were not afforded any notice with regards to the Planning Commission meeting where Delecke threatened to revoke Plaintiffs' SALU and warned that Plaintiffs would be ticketed if they failed to conform to Delecke's understanding of what items constituted outside storage. Plaintiffs satisfy the first element because they had a protected property interest in the SALU. *Hillside Prods., Inc.*, 249 F. Supp. 2d. at 893. They cannot succeed on their claim, however, because the facts available in the record, even when viewed in the light most favorable to Plaintiffs, do not support finding that Plaintiffs suffered any deprivation as a direct result of the Planning Commission meeting. The SALU was not revoked. Defendants were therefore entitled to summary judgment with respect to this claim.

### D.     Equal Protection

The Equal Protection Clause safeguards against the disparate treatment of similarly situated individuals as a result of government action that "either burdens a fundamental right, targets a suspect class, or has no rational basis." *Ctr. for Bio-Ethical Reform, Inc. v. Napolitano*, 648 F.3d 365, 379 (6th Cir. 2011) (internal quotation marks omitted). Plaintiffs' claim does not concern a fundamental right, and Plaintiffs do not purport to be part of a suspect class. Rather, Plaintiffs' claim—sometime referred to as a "class-of-one claim," *see Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000)—is premised on the theory that Defendants, due to animus, treated PME differently than similarly situated businesses. To succeed on this type of claim, a plaintiff must allege either disparate treatment from similarly situated individuals and that the government actors had no rational basis for the difference, *Assocs. of Cleveland Fire Fighters v. City of Cleveland, Ohio*, 502 F.3d 545, 549 (6th Cir. 2007), or that the "challenged government action was motivated by animus or ill-will," *EJS Properties, LLC v. City of Toledo*, 698 F.3d 845, 864 (6th Cir. 2012).

"Similarly situated" is a term of art—a comparator business must be similar in "all relevant respects." *United States v. Green*, 654 F.3d 637, 651 (6th Cir. 2011) (internal quotation

marks omitted). Plaintiffs point to a number of incidents concerning businesses that were allowed to operate without a COO, or were issued a COO after a failed inspection, or were not subjected to inspection prior to being granted a COO when the business had previously been operated under different ownership. Plaintiffs also submit Larry's Automotive, which, like PME, required a SALU but was treated more favorable. Delecke's explanation for treating Plaintiffs less favorably was that he had a "personality conflict" with John Paterek. A jury could reasonably find, on this admission alone, that PME was treated differently, not on account of any rational basis, but instead due to animus.

### E.    Qualified Immunity

Delecke asserts immunity as a public official even if Plaintiffs' rights were violated. The doctrine of qualified immunity shields government actors from being sued in their individual capacity for civil damages resulting from tortious acts committed while performing discretionary functions. *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). The immunity applies "[a]s long as [the official's] actions could reasonably have been thought consistent with the rights they are alleged to have violated." *Anderson v. Creighton*, 483 U.S. 635, 638 (1987). To succeed on a § 1983 claim, a plaintiff must demonstrate that (1) the government actor violated his or her constitutional rights, and (2) the right in question was clearly established law at the time the injury was sustained. *Saucier v. Katz*, 533 U.S. 194, 199 (2001). Liability may only arise if the defendant, "through [his] own individual actions, has violated the Constitution." *Iqbal*, 556 U.S. at 676 (emphasis added).

Defendants contend that Delecke is entitled to qualified immunity with respect to each of the constitutional claims, but they fail to offer any analysis on this point, other than to say that Delecke's actions did not offend the Constitution. This failure to address the clearly established prong of our inquiry is unsurprising given the complete absence of case law with remotely comparable fact patterns—a point, which at first glance, seems to weigh in favor of Delecke's claim for qualified immunity. *See Heggen v. Lee*, 284 F.3d 675, 686 (6th Cir. 2002) ("To determine whether a right is clearly established, this Court has instructed district courts to look at binding precedent from the Sixth Circuit, the United States Supreme Court or its own court."); *Godawa v. Byrd*, No. 14-5963, 2015 WL 4926753, ___ F.3d ___ (6th Cir. Aug. 19, 2015) ("The

Supreme Court has 'repeatedly told courts not to define clearly established law at a high level of generality.'" (citation omitted)). However, "a case directly on point" is not required to establish that the law is clearly established, *Ashcroft v. al-Kidd*, 563 U.S. 731, 131 S. Ct. 2074, 2083 (2011), because "[s]ome violations of constitutional rights are so obvious that a materially similar case" would be unnecessary, *Hearring v. Sliwowski*, 712 F.3d 275, 280 (6th Cir. 2013). At bottom, the dispositive inquiry is whether, at the time of injury, the law was "sufficiently clear [such] that a reasonable official would understand that what he [was] doing violate[d]" the plaintiff's constitutional rights. *Binay v. Bettendorf*, 601 F.3d 640, 646–47 (6th Cir. 2010) (internal quotation marks omitted).

The allegations in this case, if proven, would constitute an obvious violation of Plaintiffs' constitutional rights of which any reasonable official should have been aware. Viewed in the light most favorable to Plaintiffs, the facts suggest that Delecke used his government post to harass and retaliate against Plaintiffs by causing tickets to be issued and by denying Plaintiffs the rights bestowed to them under their SALUs. It is fundamental that the right to be free of such retaliation, arbitrary and capricious state action, and disparate treatment with no rational basis is clearly established. *See, e.g.*, *Brown v. Crowley*, 312 F.3d 782, 790 (6th Cir. 2002) (issuing baseless citations in response to a plaintiff's protected speech activities violates the First Amendment); *Warren v. City of Athens, Ohio*, 411 F.3d 697, 707–08 (6th Cir. 2005) (noting that a unilateral zoning change with respect to a vested right could violate substantive due process); *Scarbrough v. Morgan Cnty. Bd. of Educ.*, 470 F.3d 250, 261 (6th Cir. 2006) ("A plaintiff may demonstrate that the government action lacks a rational basis . . . by [showing] that the challenged government action was motivated by animus or ill-will.").

Defendants assert that Delecke cannot be held liable because he did not directly cause the injuries. Delecke had no authority to issue tickets, initiate lawsuits, or grant a time-constrained COO. However, the record evidence plainly indicates that Delecke directed LeMieux to undertake the adverse actions at issue. Whether Delecke had ultimate decision-making authority is not dispositive, because LeMieux simply "acted as the conduit [for Delecke's] prejudice—his cat's paw." *Kelly v. Warren Cnty. Bd. Of Comm'rs*, 396 F. App'x 246, 255 (6th Cir. 2010); *Bobo v. United Parcel Serv., Inc.*, 665 F.3d 741, 756 (6th Cir. 2012) ("[T]he 'cat's paw' theory . . . refers to a situation in which 'a biased [official], who lacks decision-making power,

influences the unbiased decision-maker to [take] an adverse [enforcement action].'" (citation omitted)).  In this case, LeMieux testified that he issued the tickets (and forwarded the tickets for prosecution) on Delecke's say so.  Delecke, for that reason, is the responsible party.

### F.       Municipal Liability

The Village also contests its liability on immunity grounds.  Typically, a municipality is immune from § 1983 liability, unless it can be shown that the unconstitutional actions it is charged with committing is the result of a municipal policy or custom.  *Monell v. New York City Dep't of Social Servs.*, 436 U.S. 658, 694 (1978).  The phrase policy or custom is not so limited—*Monell* (and municipal liability) "[are] . . . about responsibility," not merely written rules of conduct.  *Pembaur v. City of Cincinnati*, 475 U.S. 469, 478 (1986).  Therefore, an isolated exercise of government authority that abridges an individual's constitutional rights can give rise to municipal liability.  *Meyers v. City of Cincinnati*, 14 F.3d 1115, 1117–18 (6th Cir. 1994). For example, liability can be established by showing that "an official with final decision making authority ratified [the] illegal actions." *Id*.

Each of the alleged constitutional violations in this case stem from the decision of an official with final decision-making authority related to the particular policy at issue: LeMieux was imbued with the primary responsibility for enforcing the Village's zoning ordinances (and determining whether an ordinance had in fact been violated); LeMieux was also singularly responsible for issuing COOs; and finally, the Village Council itself caused the dissolution of the DDA.  Based on these facts, the Village is liable if a jury finds in Plaintiffs' favor.  *See Bd. of Cnty. Comm'rs of Bryan Cnty., Okla v. Brown*, 520 U.S. 397, 404 (1997) ("[P]roof that a municipality's legislative body or authorized decisionmaker has intentionally deprived a plaintiff of a federally protected right necessarily establishes that the municipality acted culpably.").

### CONCLUSION

Because a jury could reasonably find that Defendants retaliated against Plaintiffs for having complained about Village officials, in violation of the First Amendment; that Defendants arbitrarily and capriciously ticketed Plaintiffs, in violation of substantive due process; that Defendants, due to their animus against Plaintiffs, subjected Plaintiffs' business to disparate treatment, in violation of the Equal Protection Clause; and because the district court erroneously

denied Plaintiffs' civil contempt motion, we hereby **REVERSE** the grant of summary judgment in favor of Defendants, **VACATE** the district court's denial of Plaintiffs' contempt motion, and **REMAND** this case to the district court for further proceedings consistent with this opinion.